Argued and submitted May 6, 2021, decision of Court of Appeals and judgment of circuit court affirmed August 4, 2022

STATE OF OREGON,
*Respondent on Review,*

*v.*

ZACHARY DEAN CARLISLE,
*Petitioner on Review.*

(CC C18CR07005) (CA A169564) (SC S067880)

515 P3d 867

In defendant's trial for third-degree sexual assault, ORS 163.415, defendant requested a jury instruction that, in order to convict him of third-degree sexual abuse, the state was required to prove that defendant knew that the victim did not consent to sexual contact. The trial court instead granted defendant's alternative request to instruct the jury that the state was required to prove that defendant was criminally negligent as to whether the victim did not consent. The jury found defendant guilty, and the Court of Appeals affirmed. *Held*: The legislature did not intend the offense in ORS 163.415 to require proof that the defendant knew that the victim did not consent to the sexual contact.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

On review from the Court of Appeals.*

Stacy M. Du Clos, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender.

Michael A. Casper, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Walters, Chief Justice, and Balmer, Flynn, Duncan, Nelson, Garrett, Justices, and Nakamoto, Senior Judge, Justice pro tempore.**

––––––––––––––

\*  On appeal from Multnomah County Circuit Court, Eric L. Dahlin, Judge. 304 Or App 872, 466 P3d 1069 (2020).

\*\*  DeHoog, J., did not participate in the consideration or decision of this case.

FLYNN, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

Flynn, J., authored the lead opinion, in which Balmer and Nelson, JJ., joined.

Garrett, J., concurred and filed an opinion, in which Balmer, J., joined.

Walters, C. J., dissented and filed an opinion, in which Duncan, J., and Nakamoto, S. J., joined.

Duncan, J., dissented and filed an opinion, in which Walters, C. J., and Nakamoto, S. J., joined.

**FLYNN, J.**

Defendant challenges his conviction for the misdemeanor offense of third-degree sexual abuse, which required the state to prove that he "subject[ed] another person to sexual contact" and that "[t]he victim d[id] not consent to the sexual contact." ORS 163.415(1)(a)(A). The question before us is which culpable mental state applies to the "victim does not consent" element of the offense. The trial court instructed the jury that the state needed to prove that defendant "knowingly" subjected the victim to sexual contact and that defendant was "criminally negligent" with respect to the fact that the victim did not consent to the sexual contact. According to defendant, the trial court erred in refusing to instruct the jury that both elements required proof of a "knowing" mental state. We conclude, however, that the legislature did not intend that a conviction under ORS 163.415 would require proof that the defendant *knew* that the victim did not consent to the sexual contact. Accordingly, we conclude that the trial court did not err.

## I.  BACKGROUND

The charges against defendant arise out of an incident outside of a downtown Portland bar. The victim, AM, arrived at the bar with her boyfriend and a few other friends, and they encountered defendant standing just outside of the door. AM's group initially mistook defendant for a bouncer and joked around with him for a few minutes after he informed them of their mistake. Some time later, as AM's group began leaving the bar, AM stepped away from the crowd and was looking at her phone when she felt someone pull down her bra and grab her right breast. AM turned quickly to look at the person and felt something scrape across her nipple. She recognized the person who touched her as defendant, the same man whom she and her friends had earlier mistaken for a bouncer. According to AM, defendant looked at her and "said something to the effect of 'those eyes.'" AM walked away from him without responding and told her boyfriend about the incident. Defendant was eventually charged with third-degree sexual abuse based on the incident.[1]

---

[1] Defendant was also charged with, and convicted of, harassment based on the same incident. But only his conviction for third degree sexual abuse is at issue in this appeal.

When the case went to trial, defendant argued to the jury that AM was mistaken in her identification of defendant as the man who made sexual contact with her breast. But he also argued that the court should instruct the jury that third-degree sexual abuse required the state to prove beyond a reasonable doubt that defendant "knew that [AM] did not consent." In the alternative, defendant requested an instruction that the element required a culpable mental state of at least "criminal negligence."

As set out above, the trial court disagreed with defendant that the "does not consent" element requires a culpable mental state of "knowingly," and it, instead, granted defendant's alternative request to instruct the jury that the state was required to prove beyond a reasonable doubt that defendant "was criminally negligent with respect to whether [AM] did not consent" to the sexual contact. The trial court instructed the jury that, in the context of the sexual abuse charge in this case, "criminally negligent" meant that defendant failed "to be aware of a substantial and unjustifiable risk that [AM] did not consent" and that the risk was "of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in a situation." *See* ORS 161.085(10) (defining the culpable mental state of "criminal negligence"). After the jury returned a verdict of guilty, defendant appealed and assigned error to the court's instruction regarding the culpable mental state.

The Court of Appeals affirmed the conviction in a brief per curiam opinion. *State v. Carlisle*, 304 Or App 872, 466 P3d 1069 (2020). The court relied on its decision in *State v. Haltom*, 298 Or App 533, 447 P3d 66 (2019)—a case addressing the required mental state for a "does not consent" element in a different sexual abuse statute. *Carlisle*, 304 Or App 872. But this court has since reversed the Court of Appeals decision in *Haltom*, 366 Or 791, 472 P3d 246 (2020). And defendant argues that our conclusion in *Haltom* requires us to reverse the Court of Appeals in this case as well. We disagree. The statute at issue here and the statute at issue in *Haltom* describe distinct offenses that were enacted by different legislatures and reflect different legislative intent. The pertinent text, context, and legislative

history of ORS 163.415 persuade us that the trial court correctly refused to instruct the jury that defendant was guilty of third-degree sexual abuse only if he *knew* that AM did not consent to the "sexual contact."

## II.  DISCUSSION

The question of *which* culpable mental state the legislature intended for the "does not consent" element of ORS 163.415(1)(a)(A) presents a question of statutory construction that we resolve by employing our well-established analytical framework, as set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), and modified in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). Under that framework, we examine the text and context of the particular provision at issue and consider legislative history of the provision "where that legislative history appears useful to the court's analysis," all in an effort to determine the intent of the legislature that enacted the provision. *Gaines*, 346 Or at 171-72; *see also* ORS 174.020(1)(a) ("In the construction of a statute, a court shall pursue the intention of the legislature if possible.").

As pertinent to defendant's conviction, ORS 163.415(1) provides that "[a] person commits the crime of sexual abuse in the third degree" when:

"(a)   The person subjects another person to sexual contact and:

"(A)   *The victim does not consent to the sexual contact*[.]"

(Emphasis added.) The dispute in this case arises because the statute does not specify a culpable mental state for any element of the offense.[2] That challenge is one that drafters of the 1971 Oregon Criminal Code anticipated and partially addressed with a collection of generally applicable culpability provisions. *See* Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report §§ 7-11, 11 (July 1970) (explaining effort to "do

---

[2] A different challenge arises when a statute prescribes *some* culpable mental state for the defined offense but fails to specify the element or elements to which it applies. For such statutes, the legislature has specified that "the prescribed culpable mental state applies to each material element of the offense that necessarily requires a culpable mental state." ORS 161.115(1).

away with the problem that now often arises when a statute defining a crime fails to prescribe a required culpable state of mind"). Those general provisions supply "uniform" answers to many of the culpable mental state issues that arise for offenses within the Criminal Code.[3] *See State v. Owen*, 369 Or 288, 295, 505 P3d 953 (2022) (explaining that "[t]he culpability statutes were intended to provide a uniform statutory scheme for determining which elements of an offense require which culpable mental states"). The general provisions narrow—but do not fully answer—the dispute in this case.

## A.  *The General Culpability Provisions*

As pertinent to this case, one general culpability provision specifies that "a person is not guilty of an offense unless the person acts with a culpable mental state with respect to each material element of the offense that necessarily requires a culpable mental state," ORS 161.095(2),[4] and another specifies that the "culpable mental state" for an offense must be either "intentionally, knowingly, recklessly or with criminal negligence." ORS 161.085(6); *see also* ORS 161.115(2) (specifying that, "if a statute defining an offense does not prescribe a culpable mental state, culpability is nonetheless required and is established only if a person acts intentionally, knowingly, recklessly or with criminal negligence").

Those general provisions answer important questions that narrow the dispute regarding the culpable mental state for the "does not consent" element in ORS 163.415: They tell us that the legislature intended to require some culpable mental state for the "does not consent" element, even though the statute does not specify one, and they tell us the range of mental states that could apply to that element. The general provisions also supply important context

---

[3] ORS 163.415 is part of the 1971 Criminal Code. *See* ORS 161.005 (listing the provisions that "shall be known and may be cited as Oregon Criminal Code of 1971").

[4] There are limited exceptions to the requirement of ORS 161.095(2) that the state must prove a culpable mental state for "each material element of the offense that necessarily requires a culpable mental state"—the rule does not apply to offenses that constitute a violation and for offenses defined by a statute outside of the Oregon Criminal Code. ORS 161.095(2); ORS 161.105(1).

for which mental state might apply to any particular element, because they supply definitions for each of the four culpable mental states. ORS 161.085(7)-(10). Those definitions tell us that the legislature contemplated that each culpable mental state would be used for certain categories of material elements: "conduct," "circumstance," and "result." *See Owen*, 369 Or at 296 (explaining that, "by definition in ORS 161.085, each type of mental state typically relates to two of the three possible categories of material elements"). For example, because only the mental states "knowingly" and "intentionally" are defined with reference to "conduct" elements,[5] we know that the legislature generally expected those mental states to apply to "conduct" elements. *See Haltom*, 366 Or at 802 (describing a "default rule whereby, in the absence of any specification of the required mental state in a statute defining a criminal offense," a minimum culpable mental state of "knowingly" applies to "conduct" elements).

The general provisions, however, do not answer the ultimate question presented by this case, which—as framed by the parties' arguments—is limited to whether

---

[5] As definitions typically do, the provisions tell us what the legislature intended each term to mean "when used" in the code:

"(7) 'Intentionally' or 'with intent,' when used with respect to a result or to conduct described by a statute defining an offense, means that a person acts with a conscious objective to cause the result or to engage in the conduct so described.

"(8) 'Knowingly' or 'with knowledge,' when used with respect to conduct or to a circumstance described by a statute defining an offense, means that a person acts with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists.

"(9) 'Recklessly,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

"(10) 'Criminal negligence' or 'criminally negligent,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person fails to be aware of a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085(7)-(10).

the legislature intended to require a culpable mental state of at least "knowingly," or "with knowledge," for the "does not consent" element in ORS 163.415(1)(a)(A).[6] The answer to that question depends on the text, context, and legislative history of ORS 163.415. *See State v. Simonov*, 358 Or 531, 546, 368 P3d 11 (2016) (emphasizing that "[t]he determination whether a particular element of an offense within the Criminal Code requires a culpable mental state and, if so, what mental state is required, ultimately is a matter of legislative intent").

Although our conclusion that the legislature generally expected those mental states to apply to "conduct" elements supplies important context, it points us to two equally true propositions. First, if we were to determine that the legislature understood "does not consent" to be part of the "conduct" of the offense, then the context of the culpability definitions would indicate that the legislature intended the element to require a minimum culpable mental state of "knowingly." That proposition has previously allowed us to reach a "tentative conclusion" that the legislature intended to require a "knowing" mental state for a particular element. *See Haltom*, 366 Or at 811-12 (reaching that conclusion).

It is equally true, however, that if we were to determine that the legislature did not intend to require a minimum culpable mental state of knowingly for that particular element, then the context of the culpability definitions would indicate that the legislature did not understand the element to be part of the "conduct" of the offense. Thus, asking whether the legislature intended a particular element to be "conduct" supplies one contextual path to determining whether the legislature intended to require that a "knowing" mental state apply to the element, but it is not the only path for making that determination, and it does not eliminate the need to consider direct indications of which culpable mental state the legislature intended for the particular

---

[6] As indicated above, defendant argued in the alternative in the trial court for an instruction that the "does not consent" element requires a culpable mental state of "criminal negligence." There is no dispute in this court that, if the element does not require a "knowingly" mental state, then the trial court correctly instructed the jury that "does not consent" requires a culpable mental state of "criminal negligence."

element. *See id.* (emphasizing that court should consider direct indications of which culpable mental state the legislature intended for a particular element of a particular offense, regardless of whether the court is able to determine that the legislature understood a particular element to be "conduct").

Nevertheless, we explained in *Haltom* that "it is reasonable to initially focus on whether the legislature that enacted the statute intended or understood the element at issue as a circumstance or as part of the conduct that the statute proscribes." *Id.* at 802. That approach makes sense because the general culpability provisions define the term "conduct." As we observed in *Owen*, the legislature has defined "'conduct'" to mean "'an act or omission and its accompanying mental state'"; an "'[a]ct'" to mean "'a bodily movement'"; and "the verb 'to act'" to mean "'either to perform an act or to omit to perform an act.'" 369 Or at 297 (quoting ORS 161.085(1), (4), (5)). "Accordingly, conduct elements as a category are in part tied to bodily movements, by definition." *Id.* For example, the "subjects another person to sexual contact" element of ORS 163.415 clearly describes "conduct." *See* ORS 163.305(5) (defining "sexual contact" as "any touching of the sexual or other intimate parts of a person or causing such person to touch the sexual or other intimate parts of the actor for the purpose of arousing or gratifying the sexual desire of either party"). In addition, because the definition of "knowingly" refers to "'awareness that the conduct of the person is of a nature so described,'" we understand the legislature to have intended that "conduct" could include some elements that describe "the nature, that is, the essential character, of the prohibited act." *Simonov*, 358 Or at 540-41 (quoting ORS 161.085(8)). Given the legislature's guidance regarding the meaning of "conduct" elements, asking whether the legislature understood a particular element to be "conduct" often will provide the most direct path to understanding whether the legislature intended to require a "knowing" mental state for the element.

There are limits to that path, however, because there are some elements for which the categories break down. The legislature has provided no definition of "circumstance" and no line for determining in close cases whether an element

is "conduct" or "circumstance." And we reject the contention that *Simonov* and *Haltom* filled the gap that the drafters left open with a categorical "rule" that we must understand an element to be "conduct"—regardless of whether the legislature understood it to be "conduct"—"if it changes an act that is lawful into one that is unlawful." *See* 370 Or at 182-83 (Walters, C. J., dissenting). To the contrary, the analysis in both cases focused "on whether the legislature that enacted the statute intended or understood the element at issue" to be "conduct." *Haltom*, 366 Or at 802; *see id.* at 799-800 (describing *Simonov* as seeking to determine whether "the legislature had understood" the element at issue to be part of the "conduct"). Moreover, *Simonov* specifically cautioned against the kind of reasoning that would classify an element as "conduct" based on whether the element "is required to create criminal liability." *See* 358 Or at 544 (cautioning that, if it were correct that "every element that is required to create criminal liability is part of the essential character of the defendant's act or omission * * *, the meanings of conduct and circumstance would confusingly overlap").[7]

What we actually proposed in *Simonov* is that certain "guidelines are useful" to our "holistic" statutory construction inquiry and that one guideline is that, "when an element of an offense within the Criminal Code describes the nature, that is, the essential character, of a proscribed act or omission, it generally is a conduct element." *Id.* at 546. But that guideline does not mean that we have been given a test that would allow us in every case to determine whether the legislature understood a particular element to be "conduct" or "circumstance." Indeed, as we cautioned in *Simonov*, the line between the two categories—though "principled"— is "sometimes difficult to discern." *Id.* at 544.

---

[7] We recognize that the Chief Justice's dissent would draw a distinction between an element that is required to create criminal liability and an element that is required to make otherwise legal conduct illegal. 370 Or at 182 (Walters, C. J., dissenting). But we do not. Indeed, the only indication of what the 1971 Legislative Assembly may have understood "circumstance" to mean when used with reference to an element of an offense suggests that the legislature understood as "circumstance" some elements that make otherwise legal conduct illegal. *See* Commentary §§ 7-11 at 10 (referring to "the existence of specified circumstances (e.g., that property is stolen, that one has no right to enter a building, etc.)").

B.  *Where the "Conduct" Inquiry Breaks Down*

The drafters of the 1971 code were aware that some elements cannot readily be categorized as either "conduct" or "circumstance," and they intentionally did not supply a rule for distinguishing between the two. As we have previously explained, the process of creating the comprehensive revised code began in 1967 when the Legislative Assembly created the Oregon Criminal Law Revision Commission. *Gaines*, 346 Or at 178. The commission divided the task of drafting the revised code among three subcommittees, which submitted their drafts, along with commentary, to the commission as a whole. *Id.* The commission then produced and submitted to the legislature the Final Draft and Report of the Proposed Oregon Criminal Code, which included the drafters' commentary on each section of the code. *Id.*; Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report (July 1970).[8] All of the general culpability provisions described above were a part of Article 2, "General Principles of Criminal Liability," which was assigned for drafting to the commission's subcommittee 1. Or Laws 1971, ch 743, §§ 7-10; Minutes, Criminal Law Revision Commission, Subcommittee No. 1, Dec 18, 1968, 1.

The first draft of culpability provisions that the subcommittee considered spurred a great deal of debate about what constitutes an "attendant circumstance." Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Dec 18, 1968, Tape 29, Side 1. As we explained in *Simonov*, during discussion of that draft, members of the subcommittee "were divided about the meanings of conduct and circumstance" and disagreed about the "meaning of 'attendant circumstance' in a variety of hypotheticals" for which an element could not readily be categorized as "conduct" or "circumstance." *Simonov*, 358 Or at 544 (citing Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Dec 18, 1968, Tape 29, Side 1).[9]

---

[8] Given the history of the Proposed Oregon Criminal Code, which the legislature approved, "this court generally treats the Commission's records of its proceedings and its commentary on the draft code as indicative of the legislature's intent." *Haltom*, 366 Or at 809.

[9] As the minutes of the subcommittee meeting summarize the debate, members of the subcommittee engaged in "a lengthy discussion concerning the

The chair of the subcommittee expressed concern that the draft was "not drawing * * * a sufficiently clear distinction between conduct and attendant circumstances." Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Dec 18, 1968, Tape 29, Side 1 (statement of Sen John D. Burns, subcommittee chair). But the primary author of the draft culpability provisions, Professor Courtney Arthur, indicated that he did not intend to add a definition of "attendant circumstance," and two other members interjected, "I don't see how you could [settle on a definition]." *Id*. (statements of Courtney Arthur and others).

That lack of clarity followed the draft through its consideration and adoption by the 1971 legislature. The final version of the 1971 code did not add any provision to correct what Senator Burns had described as the code's failure to draw a "sufficiently clear distinction between conduct and attendant circumstances." *See id*. (statement of Sen John D. Burns). In fact, nothing in the commentary suggested to the legislature that there might be a need to clearly distinguish between the two. Given the drafters' decision to leave "attendant circumstance" undefined in the code—in part based on concern that that term might be impossible to define—we are persuaded that the legislature did not intend that all questions regarding which culpable mental state the legislature intended for a particular element would be resolved by the path of determining whether the element is more like "conduct" or more like a "circumstance."

To the extent that defendant and the Chief Justice's dissent understand *Haltom* or *Simonov* as setting us down a path of statutory construction that requires courts always to resolve whether an element should be considered conduct or circumstance as a means to determining which culpable mental state the legislature intended, we reject that understanding. *See* 370 Or at 178 (Walters, C.J., dissenting) (describing proposed analytical framework). Rather,

---

meaning of the term 'attendant circumstance,'" in which the term "was applied to hypothetical situations involving statutory rape, burglary and robbery[,] but members were unable to agree precisely on what the term was intended to cover or to articulate a clear-cut distinction between attendant circumstance and conduct." Minutes, Criminal Law Revision Commission, Subcommittee No. 1, Dec 18, 1968, 6.

*Haltom* and *Simonov* should be understood as illustrating specific applications of our usual framework for construing statutes. *Simonov* emphasizes that "[t]he statutory interpretation inquiry is holistic." 358 Or at 546. And *Haltom* does not depart from the holistic interpretation demonstrated in *Simonov. Haltom*, 366 Or at 797-801. We reiterate our observation in *Haltom* that "it is reasonable to initially focus on whether the legislature that enacted the statute intended or understood the element at issue as a circumstance or as part of the conduct that the statute proscribes." *Id.* at 802. However, if it appears from our examination of a statute's text, context, and legislative history that the legislature had no shared understanding of whether a particular element is "conduct" or an attendant "circumstance," then it makes little sense to impose our own answer to that question as a means to understanding which culpable mental state the legislature intended for the element.

C.  *Indications of Legislative Intent with Respect to ORS 163.415*

The challenge of determining which culpable mental state the legislature intended to require for the "does not consent" element in ORS 163.415 illustrates the limitations of focusing primarily on whether the legislature understood the element to be "conduct." We have explained above that the drafters of the 1971 Criminal Code were unable to agree on the difference between "conduct" and "circumstance" in close cases and that the drafters intentionally did not resolve that uncertainty. 370 Or at 147-48 (Flynn, J., lead opinion). And among the elements for which they expressed the greatest uncertainty were those that combine with sexual activity to make that activity illegal. A hypothetical offered by Professor Arthur involved the offense of statutory rape. He indicated that the age of the "young lady" would be an "attendant circumstance," and another committee member insisted that age was only an "existing fact." Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Dec 18, 1968, Tape 29, Side 1. Another member observed that "acquiescence" to a sexual act would be "the attendant circumstance, or lack thereof." *Id.* When the subcommittee's discussion later turned to the example

of "forcible rape," the committee members again expressed conflicting understandings about the role of "resistance or lack of resistance, consent or lack of consent." One member proposed that those factors would be an "attendant circumstance" and that "[t]he conduct is the act of intercourse, which is the same basically regardless of whether one is married [or] whether there's consent." But another insisted that for forcible rape, "force is part of the conduct." *Id.*

There was no greater clarity among the commission members assigned to the subcommittee that drafted the sexual offenses, subcommittee 2. Nothing in the subcommittee discussions of the sexual offenses or in the commentary to the sexual offenses suggests that the drafters of ORS 163.415 had any understanding of, or any interest in, whether "does not consent" was part of the conduct or an attendant circumstance. Indeed, the text for what became ORS 163.415 remained unchanged from the first draft, which was presented to and approved by the subcommittee without discussion. Minutes, Criminal Law Revision Commission, Subcommittee No. 2, May 3, 1969, 24-25. And the subcommittee's debates and discussion regarding the other sexual offenses in that draft are devoid of any discussion about whether the drafters of those provisions understood "does not consent" to be a conduct element. *See id.* at 1-25.

We are persuaded that the 1971 legislature had no greater clarity than did the drafters about whether the element "does not consent" in ORS 163.415 should be understood as "conduct." The crime of sexual abuse was a newly codified offense in Oregon in 1971. The commentary explained to the legislature that "[u]nder the common law such conduct would have constituted an assault." Commentary §§ 115 & 116 at 122; *see also id.* §§ 92-94 at 93 (explaining that "[o]ffensive but uninjurious sexual acts are covered by the article on sex offenses (Article 13)," rather than by the "assault" offenses). As originally adopted,[10] the statute provided:

---

[10] Any examination of the text and structure of ORS 163.415(1) must focus on the statute as adopted in 1971, because, as indicated above, it was the 1971 legislature that adopted the "does not consent" element on which defendant's conviction under ORS 163.415 was based. *See State v. Swanson*, 351 Or 286, 290,

"(1)  A person commits the crime of sexual abuse in the second degree if he subjects another person to sexual contact; and

"(a)  *The victim does not consent to the sexual contact*; or

"(b)  The victim is incapable of consent by reason of being mentally defective, mentally incapacitated or physically helpless.

"(2)  In any prosecution under subsection (1) of this section it is an affirmative defense for the defendant to prove that:

"(a)  The victim's lack of consent was due solely to incapacity to consent by reason of being under 18 years of age; and

"(b)  The victim was more than 14 years of age; and

"(c)  The defendant was less than four years older than the victim.

"(3)  Sexual abuse in the second degree is a Class A misdemeanor."[11]

Or Laws 1971, ch 743, § 115 (emphasis added).

We reject the suggestion of defendant and of the dissents that the elements of ORS 163.415(1) are so similar to the elements of the 1983 statute that we construed in *Haltom* that we must conclude that the 1971 legislature also understood the victim's nonconsent to be part of the proscribed conduct, for which a "knowing" mental state was required. 370 Or at 183-84 (Walters, C. J., dissenting); 370 Or at 194 n 3 (Duncan, J., dissenting). The 1971 legislature prohibited different conduct and used different

---

266 P3d 45 (2011) (explaining that the proper inquiry for statutory construction focuses on "the intent of the legislature that enacted the statute," although "we also consider any later amendments or statutory changes that were intended by the legislature to modify or otherwise alter the meaning of the original terms of the statute").

[11] The 1991 legislature subsequently changed the degree of the offense from second to third when it added a new form of "first degree" sexual abuse. Or Laws 1991, ch 830, §§ 1-3. And the 1995 legislature moved the act of "sexual contact" with a person who is incapable of consenting based on mental or physical incapacity, originally set out in paragraph (1)(b), to the first-degree abuse statute. Or Laws 1995, ch 657, §§ 11-12.

text and structure to describe the role of "does not consent" in ORS 163.415 than the 1983 legislature did when it amended ORS 163.425. Moreover, our conclusion in *Haltom* was informed by significant legislative history for the 1983 statute—specifically, testimony from "[t]he most conspicuous proponent" of the amendment, who repeatedly assured legislators that the state would be required to prove that the defendant "knew" that the victim did not consent. 366 Or at 819-22 (quoting statements of Peter Sandrock in Tape Recording, Senate Committee on Judiciary, SB 713, Apr 7, 1983, Tape 85, Side A; Tape Recording, Senate Committee on Judiciary, SB 483, Apr 13, 1983, Tape 91, Side B; Tape Recording, House Committee on Judiciary, June 30, 1983, Tape 485, Side A). The 1971 legislature could not have been influenced by any testimony presented to legislators in 1983. And the 1971 legislative history points to a significantly different answer regarding the question of whether the 1971 legislature understood the "does not consent" element in ORS 163.415 to be conduct, as well as regarding the broader question of what culpable mental state the 1971 legislature intended with respect to that element.

The text and commentary to other provisions in the sexual offenses section included references to the "conduct" that—at least when the element of nonconsent is based on a victim's age—appear to describe the "conduct" as the sexual act, not the nonconsent that must attend the act in order to prove a crime. *See* Or Laws 1971, ch 743, § 106 (specifying that, for all of the sexual offenses in which "the criminality of conduct depends on" the victim being under 16, it is "no defense" that the defendant "reasonably believed the child" to be older); Commentary § 105 at 106 (explaining that, for age-based sexual offenses, "age sets the basic dividing line between criminal and noncriminal conduct"); *id.* § 105 at 107 (using "conduct" to refer to the act engaged in by a victim who lacked the capacity to consent to the "sexual conduct"). That description of the "conduct" aligns with our earlier explanation that "conduct" can include an act that is criminal or not criminal depending upon the attendant circumstances. *See* 370 Or at 146 & n 7 (Flynn, J., lead opinion) (quoting *Simonov*, 358 Or at 544).

The text that the 1971 legislature adopted suggests the same distinction between the bodily act of "sexual contact" and the various forms of nonconsent that supply a separate element. As we have previously explained, "the phrase 'does not consent' in paragraph [(1)](a) of the 1971 [version of the] statute included 'the victim's *** incapacity to consent by reason of being under 18 years of age,'" in addition to factual lack of consent.[12] *State v. Ofodrinwa*, 353 Or 507, 515, 300 P3d 154 (2013) (quoting Or Laws 1971, ch 743, § 115 (omission in *Ofodrinwa*)). And in paragraph (1)(b), the legislature provided that lack of consent could be based on the victim's physical or mental incapacity to give consent. Or Laws 1971, ch 743, § 115(1)(b). Thus, the 1971 legislature described a particular act—"subjects another person to sexual contact"—and then, in separate provisions, listed alternative ways to prove a second element—that the victim did not or could not consent. Or Laws 1971, ch 743, § 115. That grammatical structure, which is maintained in the current statute, *see* ORS 163.415, is some indication that the legislature understood the second element to be a "circumstance" that attends the proscribed conduct, rather than a part of the conduct, *see Simonov*, 358 Or at 547 (pointing to the grammatical structure employed in ORS 163.415 as more likely to convey a legislative understanding that the separate provisions "described the circumstance elements attendant to those acts").

We do not point to the occasional references in the commentary suggesting that the sexual act is the "conduct," or to the grammatical structure of ORS 163.415, as *establishing* that the legislature had a clear understanding that factual lack of consent was a "circumstance" rather than "conduct." Indeed, we acknowledge that other commentary references to "conduct" could support the opposite conclusion. And we acknowledge that the text of ORS 163.415 uses a verb—"subjects"—that we described in *Haltom* as "carr[y-ing] at least an implication of unwillingness on the part of the other person" and as supporting a tentative conclusion that the 1983 legislature understood "does not consent" to

---

[12] The 1979 legislature added to paragraph (1)(b) an express reference to a victim "incapable of consent by being **under 18 years of age**." Or Laws 1979, ch 489, § 1 (boldface in original).

be part of the conduct proscribed by ORS 163.425(1)(a). 366 Or at 804-05. But those conflicting inferences illustrate why we are persuaded that the 1971 legislature had no greater understanding than did the drafters as to whether factual "does not consent" was a "circumstance" or "conduct" element in ORS 163.415.

And we are not persuaded by the dissents' insistence that we can eliminate that uncertainty surrounding the 1971 statute by invoking our conclusion in *Haltom* that the 1983 legislature understood "does not consent" to change "the essential nature" of the act of "sexual intercourse"— the primary act prohibited by ORS 163.425. *See* 370 Or at 146 (Walters, C.J., dissenting) (quoting and discussing *Haltom*, 366 Or at 804); *see also* 370 Or at 194 n 3 (Duncan, J., dissenting) (also discussing *Haltom*). The Chief Justice's dissent seemingly understands that phrase to mean "essential to making the act unlawful," which perhaps explains that dissent's insistence that "does not consent" must be a "conduct" element in ORS 163.415 because the act— "sexual contact"—is unlawful only when the victim does not consent. 370 Or at 184 (Walters, C.J., dissenting). But a closer examination of *Haltom* reveals that we used the concept of the "essential nature" of an act to refer more narrowly to qualities that fundamentally define the act itself.

In *Haltom*, this court accepted without discussion the defendant's unchallenged premise that consent is a fundamental quality of the act of "sexual intercourse,"[13] as that act is "ordinarily" understood. *See* 366 Or at 804 (accepting the defendant's characterization of "sexual intercourse" as an act that "is ordinarily considered natural and mutually desirable"); *see also* ORS 163.305 (specifying since 1971 that the term "[s]exual intercourse," as used in the sexual offense statutes, "has its *ordinary* meaning" (emphasis added)). Our acceptance of that premise explains why *Haltom* describes the defendant's argument as "reflect[ing] the reasoning

---

[13]  In briefing to this court, the defendant in *Haltom* had characterized lack of consent as an element that "transforms one of the most natural and necessarily-enduring of all human interpersonal acts into a violent crime," and the state had agreed that "lack of consent is what transforms otherwise natural and lawful conduct into criminal behavior."

that led this court to declare, in *Simonov*, that it 'border[ed] on the axiomatic' that the lack of consent" was part of the conduct that the crime of Unlawful Use of a Vehicle proscribed. *Haltom*, 366 Or at 804 (quoting *Simonov*, 358 Or at 548 (second brackets in *Haltom*)). In *Simonov*, the prohibited conduct was so fundamentally different from consensual use of a vehicle that the conduct historically had its own name—"joyriding." *See* 358 Or at 548 (explaining that "[t]he nature of joyriding is the temporary use of a vehicle without permission").

Whatever the merit of our acceptance in *Haltom* of the premise that "sexual intercourse" is fundamentally a consensual act, the legislative history of ORS 163.415 persuades us that the 1971 legislature did not understand "sexual contact" to be a fundamentally consensual act. Instead, the code defined "sexual contact" in a way that described acts that might or might not be consensual, or mutually desirable. *See* Or Laws 1971, ch 743, § 104(7) (defining "sexual contact" to mean "any touching of the sexual or other intimate parts of a person not married to the actor or causing such person to touch the sexual or other intimate parts of the actor for the purpose of arousing or gratifying the sexual desire of either party"). The commentary, similarly, described "sexual contact" as an act that was not fundamentally either consensual or nonconsensual. *See* Commentary §§ 115 & 116 at 122 (explaining that "sexual contact" could "be with either the victim or the actor but it need not be between them" and that it need only be for "the purpose of arousing or gratifying the sexual desire of either party" (internal quotation marks omitted)). And, as described above, the commentary repeatedly refers to the "conduct" for a sexual offense in a way that likely suggested to the 1971 legislature that the prohibited "conduct" was the sexual act, which could be either criminal or not depending on context. *See* 370 Or at 152 (Flynn, J., lead opinion). In short, we are not persuaded that the 1971 legislature considered consent to be part of the essential nature of "sexual contact," and we thus are not persuaded that the legislature understood the lack of consent to be part of the "conduct" that ORS 163.415 describes. We decline to force a categorization on the "does not consent" element in ORS 163.415 when the text, context,

and legislative history persuade us that the legislature had no understanding of whether the element was "conduct" or "circumstance." Thus, because the categorization breaks down for the "does not consent" element of ORS 163.415, asking whether the legislature understood the element to be "conduct" or "circumstance" is not a helpful path to understanding which culpable mental state the legislature intended for that element.

Accordingly, we draw our understanding of which culpable mental state the 1971 legislature intended for the "does not consent" element in ORS 163.415 from our examination of other indications of legislative intent that more directly answer that question, and those indications of legislative intent persuade us that the 1971 legislature did not intend to require proof that a defendant acted "knowingly" with respect to the fact that the victim did "not consent" to the sexual contact. Our inquiry is aided by extensive statutory context, which was not available for the 1983 amendment that we considered in *Haltom*, because the offense at issue here was enacted as part of an article of the 1971 Criminal Code in which the drafters comprehensively addressed all of the "Sexual Offenses." Or Laws 1971, ch 743, §§ 104-120 (Article 13).

An important part of that context begins with the code's identification of alternative ways to prove "lack of consent" to a sexual offense. The commentary explains that "[l]ack of consent is the common denominator for all" of the sexual offenses and that there were generally three ways for a sexual act to be committed on a person without consent: "(1) when the victim is forcibly compelled to submit; (2) when the victim is considered to be incapable of consenting as a matter of law; and (3) when the victim does not acquiesce in the actor's conduct." Commentary § 105 at 106. A person could be "considered incapable of consenting to a sexual act" based on age, mental incapacity, or physical helplessness. Or Laws 1971, ch 743, § 105. And we have previously reasoned that the 1971 code treated victims who lacked the capacity to consent as functionally equivalent to victims who factually did not consent. *See Ofodrinwa*, 353 Or at 514 (explaining that "[t]he 1971 Criminal Code retained the understanding of consent that had preceded it"—that, "[f]or

the purposes of sex crimes, a victim who lacked the capacity to consent stood in the same position as a victim who did not actually consent"). Indeed, as explained above, the 1971 legislature understood a victim's factual lack of consent to be so equivalent to age-based lack of consent that the two forms of lack of consent were covered by the same "victim does not consent" paragraph of the offense that is codified at ORS 163.415. 370 Or at 153 (Flynn, J., lead opinion) (citing *Ofodrinwa*, 353 Or at 515). In other words, the 1971 legislature intended that factual lack of consent and age-based lack of consent, as well as lack of consent based on mental or physical incapacity, would be alternative ways of proving nonconsent for purposes of a single offense: sexual abuse in the second degree, punishable as a Class A misdemeanor. Or Laws 1971, ch 743, § 115(1), (3).

Given that legislative intent, statutes in which the 1971 legislature addressed the defendant's culpable mental state with respect to some of the ways of proving that a victim did not consent can inform our understanding of how the 1971 legislature viewed the culpable mental state that would be required for the "does not consent" element in the offense that became ORS 163.415. The most pertinent of those contextual statutes is ORS 163.325, which the legislature also adopted in 1971 and which addressed proof of a culpable mental state when a victim's lack of consent to sexual offense was based on age or mental or physical incapacity.[14] ORS 163.325 specified:

"(1)   In any prosecution under ORS 163.355 to 163.445 in which the criminality of conduct depends on a child's being under the age of 16, it is no defense that the defendant did not know the child's age or that the defendant reasonably believed the child to be older than the age of 16.

"(2)   When criminality depends on the child's being under a specified age other than 16, it is an affirmative defense for the defendant to prove that the defendant reasonably believed the child to be above the specified age at the time of the alleged offense.

---

[14] ORS 163.325 remained in the same form from 1971 through the time of the offense for which defendant was prosecuted. *See* Or Laws 2021, ch 82, § 3; Or Laws 2021, ch 410, § 1. Thus, we cite the original version of the statute without reference to a particular year.

"(3)   In any prosecution * * * in which the victim's lack of consent is based solely upon the incapacity of the victim to consent because the victim is mentally defective, mentally incapacitated or physically helpless, it is an affirmative defense for the defendant to prove that at the time of the alleged offense the defendant did not know of the facts or conditions responsible for the victim's incapacity to consent."

In other words, the 1971 legislature would have understood that, when the offense that it classified as sexual abuse in the second degree was to be proven by evidence that a victim was under 16, the state would not be required to prove that the defendant *knew* of that basis for nonconsent, because even a defendant's reasonable belief that the child is older than 16 was "no defense." *See* ORS 163.325(1). The legislature would have understood that, for cases in which the offense was to be proven by evidence that a victim was between 16 and 18, the state would not be required to prove that the defendant *knew* of that basis for nonconsent, because even a defendant who did not know of the child's age was assigned the burden to affirmatively prove "that the defendant reasonably believed" the child to be older than 18. *See* ORS 163.325(2). And the legislature would have understood that, for cases in which the offense was to be proven by evidence that the victim was mentally or physically incapacitated, the state would not be required to prove that the defendant *knew* of that basis for nonconsent, because lack of knowledge "is an affirmative defense for the defendant to prove." *See* ORS 163.325(3).

We do not suggest that—in 1971—ORS 163.325 addressed whether the state would be required to prove that the defendant *knew* of the basis for nonconsent when the offense defined in ORS 163.415 was to be proven by evidence that a victim factually did not consent; it did not.[15] Or Laws

---

[15]   The 2021 legislature amended ORS 163.325 in a way that makes a similar affirmative defense available when lack of consent is based on factual lack of consent. *See* Or Laws 2021, ch 410, § 1. The amendment added:

"(4)   In any prosecution under ORS 163.415 or 163.425 in which the victim's lack of consent is not based on the incapacity of the victim to consent because of the victim's age, it is an affirmative defense for the defendant to prove that, at the time of the alleged offense, the defendant reasonably believed that the victim consented to the sexual contact, sexual intercourse or oral or anal intercourse."

1971, ch 743, § 106. Nor do we suggest that ORS 163.325 establishes a uniform culpable mental state that applies to the forms of nonconsent that the statute addresses. But ORS 163.325 supplies a clear indication that the 1971 legislature did not intend to require proof that the defendant knew of the basis for nonconsent when the offense set out in ORS 163.415 was proven by evidence that the victim was younger than 18 or that the victim was mentally or physically incapacitated. That relevant context informs our assessment of defendant's claim—and the dissents' claims—that the 1971 legislature *did* intend to require proof that the defendant *knew* of the basis for nonconsent when the offense set out in ORS 163.415 was to be proven by the alternative of evidence that the victim factually did not consent.

        ORS 163.325 informs our assessment of that claim because it points to competing inferences about what the legislature intended for ORS 163.415, and one of those inferences is far more plausible. One possibility, which defendant and the dissents embrace, is that the 1971 legislature intended to require a knowing mental state for only one of the alternative ways of proving nonconsent under ORS 163.415—and simply failed to mention that intended disparity in the text of the statute. Such an omission would have been a significant oversight given that the 1971 legislature considered victims who lacked the capacity to consent, and the defendants who subjected them to sexual contact, to be functionally equivalent to victims who factually did not consent, and the defendants who subjected them to sexual contact. *See* 370 Or at 156-57 (Flynn, J., lead opinion) (discussing indications that the legislature understood those functional equivalencies). And such an omission would be particularly significant given that the 1971 legislature covered both age-based and fact-based lack of consent under the same paragraph—"(a) The victim does not consent to the sexual contact." Or Laws 1971, ch 743, § 115; *see Ofodrinwa*, 353 Or at 515 (explaining that "'does not consent' in paragraph [(1)](a) of the 1971 [version of the] statute included 'the victim's *** incapacity to consent by

---

*Id*. The effect of that amendment on prosecutions under ORS 163.415 is not at issue in the case before us. And our references to ORS 163.325 are to the statute as enacted.

reason of being under 18 years of age'" as well as factual lack of consent (quoting Or Laws 1971, ch 743, § 115). The care with which the 1971 code was drafted persuades us that, if the 1971 legislature had intended to require proof that the defendant knew of the nonconsent for only one of the alternative ways of proving the offense set out in ORS 163.415, it would have specified that intent in the text of the statute.

The more plausible way to understand why the 1971 legislature would have failed to specify, in the text of the statute, that the offense of second degree sexual abuse would require proof of a knowing mental state for just one of the alternative ways of proving the nonconsent element of that offense is that the legislature did not intend to require proof of a knowing mental state for just one of the alternative ways of proving the nonconsent element of the offense set out in ORS 163.415. That conclusion does not mean that the legislature intended to create a strict liability crime. As we emphasized in *Owen*, the Criminal Code requires some culpable mental state for each material element that "'necessarily requires a culpable mental state,'" and the minimum culpable mental state under the Oregon Criminal Code is "criminally negligent."[16] 369 Or at 296 (quoting ORS 161.095(2)). And even the "criminally negligent" mental state requires proof that the defendant "fail[ed] to be aware of a substantial and unjustifiable risk" that the victim did not consent and that the risk was "of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." ORS 161.085(10). But we are not persuaded that the legislature intended to permit individuals to gratify their sexual desires by touching the "sexual or other intimate parts" of nonconsenting strangers as long as the toucher does not have *knowledge* that the stranger does not consent. *See* Or Laws 1971, ch 743, § 104(7) (defining "'[s]exual contact'" in that way).

---

[16] We explained in *Owen* that the legislature used the phrase "that necessarily requires a culpable mental state" to clarify "that culpable mental states do not apply to elements of an offense relating to when and where a crime could be prosecuted, like the statute of limitations, jurisdiction, and venue * * *, but do apply to elements that define whether a defendant has committed an offense." 369 Or at 316-17 (internal quotation marks omitted).

Defendant and the dissents, nevertheless, insist that the legislature would have had no reason to articulate an intent to require a knowing mental state for just one of the alternative ways of proving the nonconsent element of the offense set out in ORS 163.415 because—they propose—the legislature adopted a "general rule" that required a defendant to know that a victim did not consent. But the "general rule" theory does not hold up to scrutiny. According to defendant, the legislature was aware of and intended to adopt a "general rule" regarding all of the sex offenses—"that the state ordinarily must prove that the defendant *knew* that the victim in fact did not consent." The dissents' proposal is similar. *See* 370 Or at 192-93 (Duncan, J., dissenting) (asserting and discussing a general rule "that a defendant had to know the facts that caused his actions to be criminal"); *see also* 370 Or at 185-87 (Walters, C. J., dissenting) (discussing the same "general rule"). Assuming that "general rule," defendant and the dissents reason that the legislature intended that ORS 163.415 would require actual knowledge that the victim did not consent whenever that element was proven through the victim's factual lack of consent.

The first challenge to that proposal is that there is no support for the existence of the "general rule." Although defendant cites *Haltom* as the supposed source of this "general rule," *Haltom* used the term in the context of describing one of the arguments that had been advanced by the defendant in that case. 366 Or at 816-17. Moreover, *Haltom* discussed the defendant's "general rule" as a general rule against *strict liability* offenses (meaning those requiring no culpable mental state). *See id.* at 818 (explaining that the "defendant's claim that, historically, strict liability applied *only* in sex crime cases in which the victim's nonconsent was legally implied based on age or incapacity" was potentially undermined by a portion of the commentary that could be read as suggesting that, historically, "no mental state requirement attached to the element of nonconsent in *any* of its forms" (emphasis in original)). A general rule against offenses that require no culpable mental state is irrelevant to the legislature's intent with respect to ORS 163.415, which—as we have explained—requires proof of

some culpable mental state when the victim's lack of consent takes the form of factual failure to consent. *See* 370 Or at 160 (Flynn, J., lead opinion).

There also is no support in the 1971 Criminal Code or its commentary to support defendant's claim that the legislature intended to adopt a "general rule" that the defendant must *know* the facts that caused his actions to be criminal. Both dissents identify a reference in the commentary to a rule that "knowledge of the victim's age is not an essential element of the crime of statutory rape and therefore justifiable ignorance of age is not a defense in a prosecution for" statutory rape as "apparently an exception to the general rule that guilt attaches only where the accused intended to do the prohibited act." 370 Or at 186 (Walters, C. J., dissenting) (quoting Commentary § 106 at 108); 370 Or at 192 (Duncan, J., dissenting) (quoting Commentary § 106 at 108). But that reference to the accused having "intended to do the prohibited act" likely would have been understood by the legislature as a reference to the general rule requiring "criminal intent"—meaning *some* culpable mental state—a rule to which a strict liability crime like statutory rape was an exception. *See, e.g.*, *State v. Ankeny*, 185 Or 549, 563, 204 P2d 133 (1949) (explaining that, "[t]o constitute a crime the act must, except as otherwise provided by statute, be accompanied by a criminal intent on the part of accused, or by such negligent and reckless conduct and indifference to the consequences of conduct as is regarded by the law as equivalent to a criminal intent" (internal quotation marks omitted)). In any event, whatever the legislature understood by that reference to an existing "general rule," it is clear that the legislature did *not* intend to adopt a "general rule" requiring proof that a defendant must *know* the facts that caused the defendant's actions to be criminal. *See Haltom*, 366 Or at 798-99 (explaining the legislature's general rules regarding culpable mental states in a way that make clear "intentionally" was not generally required for any type of element).

Nor does it make sense to suggest that the legislature adopted any "general rule" that would require a defendant to know that the victim did not consent to sexual

contact. Of the various sexual offense provisions enacted in the original 1971 code, the offense set out in ORS 163.415 was the only sexual offense that could be proven by evidence that the victim factually did not consent. *See* Or Laws 1971, ch 743, §§ 109-120. Moreover, the commentary told the legislature that the offense of sexual abuse had its origin in common law "assault," and it described common law assault to the legislature in a way that would not have suggested a general rule that the defendant always must know that the victim factually did not consent. *See* 370 Or at 150 (Flynn, J., lead opinion) (quoting Commentary §§ 115 & 116 at 122); Commentary §§ 92-94 at 94 (explaining that "consent" at common law was only sometimes "a defense to a prosecution for assault"); *see also Ibach v. Jackson*, 148 Or 92, 103, 35 P2d 672 (1934) (reciting that, "if two men agree to fight and one is injured, the law will not excuse on account of the consent given to the assault" (internal quotation marks omitted)).[17]

Thus, we are not persuaded that the legislature intended to adopt a "general rule" that the defendant must *know* "that the victim in fact did not consent" to the defendant's sexual conduct. In the absence of such a "general rule," which might have explained the failure of the 1971 code to specify in the text of the offense set out at ORS 163.415 that the state would be require to prove that the defendant *knew* of the basis for nonconsent for one—and only one—of the multiple, alternative ways to prove the element of nonconsent, the omission is most plausibly understood as deliberate: The legislature did not specify that that the state would be require to prove that the defendant *knew* of the basis for

---

[17] Justice Duncan's dissent asserts that "factual nonconsent has historically been subject to a higher culpability requirement than legal consent." 370 Or at 193 (Duncan, J., dissenting) (emphasis omitted). As explained above, however, *factual* nonconsent to a sexual act, under the 1971 code, was a way of proving only the element of nonconsent for the *newly* enacted sexual offense of second-degree sexual abuse—and thus had no historical counterpoint. 370 Or at 163 (Flynn, J., lead opinion). To the extent that that dissent has in mind the historical form of nonconsent that the code calls "forcible compulsion," *see* Or Laws 1971, ch 743, § 104(3) (defining "forcible compulsion"); *see also id.* §§ 111, 114, 116 (including as an element that the victim "is subjected to forcible compulsion" by the defendant), we express no opinion regarding whether the legislature would have understood that way of proving nonconsent to require a higher culpable mental state.

nonconsent for one—and only one—of the multiple, alternative ways to prove the element of nonconsent, because the legislature did not intend to require that any of the alternative ways to prove the element of nonconsent for that statute would require the state to prove that the defendant *knew* of the basis for nonconsent.

Justice Duncan's dissent suggests that our construction of the statute creates an incongruity: Under the 1971 code, a defendant who was charged with second degree sexual abuse based on evidence that the victim was mentally or physically incapable of consenting to the sexual contact could have avoided conviction by proving that he did not *know* of the incapacity, while a comparable defense would have been unavailable to a defendant who was charged with the same offense based on evidence that the victim factually did not consent. 370 Or at 193 (Duncan, J., dissenting). But there is no incongruity. Regardless of whether a victim has a mental or physical incapacity to consent, if that victim factually does not consent, then it is no defense to a prosecution under ORS 163.415 that the defendant did not *know* that the victim did not consent. Although the 1971 legislature made the same conduct a crime if the victim was mentally or physically incapable of consenting, ORS 163.325 reflects the legislature's recognition that some victims who appear to factually give consent are, nevertheless, incapable of giving that consent. There is nothing incongruous about the legislature allowing defendants in those encounters to avoid prosecution by proving that they actually did not know that the victim who appeared to give consent was incapable of doing so.

As a final argument, defendant urges us to infer that the legislature must have intended to require that defendants know that the victim does not consent, given the classification of the offense defined in ORS 163.415 as a Class A misdemeanor. We are not persuaded. Defendant relies on *Haltom* and *Simonov*, in which we described the legislature's decision to punish those offenses as *felonies*—a severe consequence—as some indication the legislature would have intended to require a "knowing" mental state. *Haltom*, 366 Or at 812; *Simonov*, 358 Or at 548. Defendant

transforms that reasoning into a premise that any "serious offense" classification suggests a legislative intent to require a knowing mental state for all elements of the offense, and defendant contends that the legislature's classification of ORS 163.415 as a "Class A misdemeanor" makes it a "serious offense."

Although we do not question defendant's assertion that a Class A misdemeanor is a "serious offense," there is no basis for defendant's assumption that the classification suggests an intent by the 1971 legislative to require a knowing culpable mental state when the "does not consent" element is proven by evidence that the victim factually did not consent. As we have already explained, that was only one of multiple, alternative ways to prove the element of nonconsent for the same offense. Or Laws 1971, ch 743, § 115. And the legislature made all forms of the offense punishable as a Class A misdemeanor, even though it clearly intended that the other ways of proving nonconsent would not require proof that the defendant knew of the basis for the nonconsent. *See* 370 Or at 158-59 (Flynn, J., lead opinion) (discussing significance of ORS 163.325 with respect to culpable mental states for the original version of ORS 163.415); *see also id.* at 158 n 15 (Flynn, J., lead opinion) (noting subsequent different treatment of nonconsent based on mental or physical incapacity). There is no reason to assume that the classification as a Class A misdemeanor has a different significance for convictions based on proof that the victim factually did not consent.

III.   CONCLUSION

As explained above, the crime now classified as sexual abuse in the third degree, ORS 163.415, is the one sexual offense from the original 1971 Criminal Code in which the legislature criminalized sexual conduct when the victim factually "does not consent" to the conduct. 370 Or at 163 (Flynn, J., lead opinion). We conclude that a conviction for the offense requires proof that a defendant acted "knowingly" with respect to the prohibited conduct—"sexual contact"—but permits proof of a less culpable mental state with respect to the fact that the victim "does not consent to the sexual contact."

In reaching that conclusion, we have employed our well-established methodology and considered all indications of legislative intent from the text, context, and legislative history of the statute. Relevant context includes the code's definitions of the culpable mental states, which indicate that the legislature generally intended the minimum culpable mental state for "conduct" elements to be "knowingly" and for "circumstance" elements to be "criminally negligent." But that is not always a helpful path for determining which culpable mental state the legislature intended.

Here, we know that the drafters had no shared understanding about whether the victim's lack of consent to sexual contact was part of the proscribed "conduct," as opposed to an attendant "circumstance." And nothing in the statute that the legislature adopted or the commentary that the legislature had before it suggests that the legislature had any greater clarity than the drafters about the category under which "does not consent" should be classified. Thus, looking to the context provided by the culpability definitions ultimately does not advance our understanding of which culpable mental state the legislature intended for that element. But our holistic examination of the text, context, and legislative history of ORS 163.415 persuades us that the legislature did not intend that offense to require proof that the defendant *knew* that the victim did not consent to the sexual contact. Accordingly, the trial court did not err when it declined to instruct the jury that, to convict defendant of third-degree sexual abuse under ORS 163.415(1)(a)(A), it needed to find that defendant knew that the victim did not consent to the sexual contact.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

Balmer and Nelson, JJ., join in this lead opinion.

**GARRETT, J.,** concurring.

I agree with the court's disposition of this case, but I would approach the analysis somewhat differently. Like both the lead opinion and the dissents, I would begin by asking whether the legislature understood a victim's lack of consent to be part of the "conduct" regulated by ORS 163.415(1), the

third-degree sexual abuse statute. Unlike the lead opinion, which finds no answer to that question, and unlike the Chief Justice's dissent, which answers it "yes," I would answer it "no." I acknowledge that that conclusion is in tension with this court's recent decision in *State v. Haltom*, 366 Or 791, 472 P3d 246 (2020). Although I joined that opinion, I have come to doubt that its reasoning is entirely sound. I write separately in part to explain why I believe some aspects of *Haltom*'s analysis should be reconsidered.

Beginning with the methodological question on which the lead opinion and the Chief Justice's dissent part company, I agree with the lead opinion that a strict, two-step "default rule" construct is not absolutely required. Our opinions in *Haltom* and *State v. Simonov*, 358 Or 531, 368 P3d 11 (2016), do indicate that, where a criminal statute does not specify the mental state for an element, the interpretative exercise should, *first*, ask how the legislature intended to categorize the element (as conduct, circumstance, or result). The answer to that question will lead to a tentative conclusion about which mental state applies. The second interpretative step is to consider any other evidence that would confirm or rebut that tentative conclusion. On the other hand, it is not even clear that *Simonov* itself followed that two-step process, as we observed in *Haltom*. 366 Or at 802 (noting that *Simonov*'s analysis is "not entirely compatible" with a rigid "default rule" approach). As for *Haltom*, we ultimately said only that "we think that it is reasonable to initially focus" on whether the legislature had an understanding as to whether an element was conduct or circumstance. 366 Or at 802. That wording leaves future courts with latitude to approach the analysis differently.

Nevertheless, for all the reasons that this court articulated in *Simonov*, *see* 358 Or at 537-40, the question of how to categorize the element at issue is the right place to begin, in light of the general culpability statutes. I do not understand the lead opinion to say otherwise. Therefore, in this case, I would begin by asking whether the enacting legislature would have understood the "does not consent" element in ORS 163.415(1)(a)(A) as a conduct element or, instead, as a circumstance element. If we can answer that

question, we know what mental state the legislature presumptively intended would apply.

Although the lead opinion ultimately concludes that the answer is not clear, the opinion cites contextual and historical evidence to suggest that, in the context of sexual offenses, the 1971 legislature would have understood the "conduct" to consist of the sexual acts described in the statute, with the "does not consent" element being an attendant circumstance. *See* 370 Or at 149-50, 151-53 (Flynn, J., lead opinion).

More fundamentally, that conclusion follows from strong *textual* evidence, namely the statutory definitions of the relevant terms. That is illustrated through several steps. First, ORS 161.085(4) provides that, for purposes of the Criminal Code, "'[c]onduct' means an act or omission and its accompanying mental state." No "omission" is at issue here, so the key word is "act," which also is a defined term. Under subsection (1) of the same statute, "'[a]ct' means a bodily movement." Thus, the applicable meaning of "conduct" is "[a bodily movement] and its accompanying mental state." As we explained in *Simonov*, the accompanying mental state for a conduct element must be, at a minimum, knowledge, which is defined to mean "that a person acts with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists." ORS 161.085(8).

Putting those definitions together, then, a "conduct" element of a criminal offense statute refers to a bodily movement that is accompanied by an awareness on the part of the actor that the bodily movement is "of a nature so described."

Turning to the statute at issue here, ORS 163.415 provides:

"(1)   A person commits the crime of sexual abuse in the third degree if:

"(a)   The person subjects another person to sexual contact and:

"(A)   The victim does not consent to the sexual contact; or

"(B)  The victim is incapable of consent by reason of being under 18 years of age[.]"

The "act" or "bodily movement" described by the statute is "subject[ing] another person to sexual contact." ORS 163.415 (1)(a). We know that, to qualify as "conduct," that bodily movement must be accompanied by the actor's "awareness" that the bodily movement "is of a nature so described." ORS 161.085(8). The "nature" of the bodily movement described in the statute is *sexual* contact, which also is a defined term: "'Sexual contact' means any touching of the sexual or other intimate parts of a person or causing such person to touch the sexual or other intimate parts of the actor for the purpose of arousing or gratifying the sexual desire of either party." ORS 163.305(5).

Therefore, once again synthesizing the definitions, the conduct described in ORS 163.415(1)(a) is "subject[ing] another person to [any touching of the sexual or other intimate parts of a person *** for the purpose of arousing or gratifying the sexual desire of either party]," with an "awareness" that the described bodily movements have that "nature." Thus, a person who engages in touching another person's "sexual or other intimate parts" does not commit third-degree sexual abuse if the person lacks either the described "purpose" or, for whatever reason, an "awareness" that those movements have a sexual nature.

The statute adds another element: that the victim "does not consent." ORS 163.415(1)(a)(A). The lack of consent, however, cannot easily be understood as part of the "bodily movement" described in the preceding subparagraph. A person who engages in bodily movements that constitute sexual contact either has an awareness that those movements are sexual in nature or does not have that awareness, but that awareness would not depend on the state of mind of the *other* person. Sexual contact is defined as the touching of sexual or intimate parts "for the purpose of arousing or gratifying the sexual desire of *either* party." ORS 163.305(5) (emphasis added). Under that definition, the subjective state of mind of the person on the receiving end of the "touching" need not even be considered. Moreover, subparagraph (B) of the statute describes one form of lack of consent based solely

on the victim's age, which means that the statute encompasses situations where the victim factually consents *and the actor has that understanding.* It is thus implausible to understand the "bodily movement" described in the statute as somehow incorporating a lack of consent on the part of the victim.

In short, a straightforward application of the relevant definitions supports the conclusion that the "conduct" described in ORS 163.415(1)(a) is sexual contact done with an awareness that the contact has that nature. The victim's lack of consent is an essential element of the offense, but it is not part of the actor's "conduct." On a blank slate, I believe that conclusion would be drawn without much difficulty.

We are not writing on a blank slate. In *Haltom*, this court considered a different sexual offense statute, ORS 163.425 (defining second-degree sexual abuse), and concluded that the victim's lack of consent is a conduct element. 366 Or at 823. The Chief Justice concludes that the parallels are obvious and that *Haltom* dictates the result here. 370 Or at 184 (Walters, C. J., dissenting). The lead opinion responds that the two statutes differ in their text, context, and legislative history. 370 Or at 151-52 (Flynn, J., lead opinion). Both opinions, therefore, proceed from the premise that *Haltom* is soundly reasoned. However, aspects of *Haltom*'s reasoning are problematic.

In *Haltom*, this court took as its starting point what it understood to be the key explanation in *Simonov*:

> "'[C]onduct' elements are those that describe the 'nature or essential character of the defendant's act or omission' or, in other words, that 'make the defendant's own act or omission of a described nature.' 'Circumstance elements,' in contrast, are 'facts that attend or accompany the defendant's conduct,' and 'do[] not change the essential character of the prohibited conduct.'"

366 Or at 799 (quoting *Simonov*, 358 Or at 541, 542, 544 (internal citations omitted)). *Haltom* then held that a victim's nonconsent changes the "essential nature" of sexual intercourse. *Id.* at 804, 811, 823.

*Haltom* did not justify its reasoning with reference to the relevant definitions. The court did not explain how a victim's lack of consent to sexual contact is part of the actor's "bodily movement," nor did it explain how a victim's lack of consent connects to an actor's "awareness" that the bodily movement is of a sexual nature. Instead, *Haltom* framed its analysis in terms that it drew from *Simonov*, which dealt with a completely different type of criminal activity, the unauthorized use of a vehicle. To understand *Haltom*, then, it is critical to understand what *Simonov* held.

*Simonov* thoroughly reviewed the general culpability statutes and the definitions of "conduct" and "act," concluding that, "[r]ead together, then, the definitions of the mental states that apply to 'conduct' indicate that they do not merely apply to a particular bodily movement; they also more broadly apply to other elements that describe the nature, that is, the essential character, of the prohibited act." 358 Or at 540-41 (citing *Webster's* definition of "nature" as "the essential character or constitution of something"). Separately, the court explained, "conduct elements are those that describe the nature or essential character of the defendant's act or omission." 358 Or at 541; *see also id.* at 544 ("To constitute conduct, an element must make the defendant's own *act or omission* of a *described nature*[.]" (Emphasis added.)).

*Simonov* was not, in that portion of the opinion, purporting to do anything more than summarize the plain meaning of the definitional statutes. All that the court meant to say, as I understand that opinion, is what those statutes clearly tell us. The conduct element of an offense is determined by considering, first, what "bodily movement" is described by the statute, and, second, what else in the statute gives that described act its "nature" or "essential character." That follows directly from the definitions of "conduct" (an "act" and "its accompanying mental state") and "knowingly" ("an awareness that the conduct of the person is of a nature so described"). *See* ORS 161.085(4), (8).

The difficulty highlighted by *Simonov*, *Haltom*, and this case is that the question "What parts of a statutory offense give an act its essential character?" can be

understood in two different ways. One might understand the question to ask, "What is the essential character of the act that the statute *describes*?" Alternatively, one might understand the question to ask, "What is the essential character of the act that the statute *prohibits*?" The problem with the second framing of the question is that it introduces circularity into the analysis. As *Simonov* pointed out,

> "It could be argued, in a broad sense, that *every element that is required to create criminal liability* is part of the essential character of the defendant's act or omission. If that view were correct, the meanings of conduct and circumstance would confusingly overlap. But, as our previous decisions show, the line between the two types of elements, although sometimes difficult to discern, nevertheless is a principled one. *To constitute conduct, an element must make the defendant's own act or omission of a described nature*, which stands in contrast to circumstance elements of an offense that refer to facts that attend or accompany the defendant's conduct."

358 Or at 544 (emphases added). What the court recognized in that paragraph is that referring to an "act" as "prohibited" (as even *Simonov* did in places) can be conceptually muddy, because an act is not prohibited unless *all* the elements of a statutory offense are in place, including both conduct and other elements. Thus, when a court refers to the "proscribed act" or "prohibited act" in a criminal statute, what the court really means is the *described* act, which the statute criminalizes *when combined* with other elements. *Simonov* reflects that understanding in concluding that the "essential character" of an act is that which "make[s] the defendant's own *act* or omission of a *described* nature." *Id.* (emphasis added). The essential character cannot be determined by asking what makes the act "criminal." As *Simonov* pointed out, the answer to that question would be "every element," which would give us no basis for distinguishing between conduct and circumstances.

    *Simonov* went on to hold that, in the unauthorized use of a vehicle (UUV) statute, the phrase "without the consent of the owner" is "part of the nature or essential character of the act proscribed by that statute." *Id.* at 546. The court relied heavily on the grammatical structure, noting

that "without the consent of the owner" is an adverbial phrase that, in context, "describes how the person rides." *Id.* In doing so, the court noted that the legislature could have indicated a different understanding by describing the physical act and the lack of consent in "separately numbered provisions" or "independent clauses." And, of course, the court cited the statute at issue in this case, ORS 163.415, as an example of doing just that.

The *Simonov* court also supported its conclusion by explaining that the UUV statute prohibits what is commonly known as "joyriding," and the court took it as nearly "axiomatic" that unauthorized use is inherent in the concept of that *act*. 358 Or at 548. Taken as a whole, considering the care that *Simonov* took in working through the statutory definitions, that opinion is properly understood to hold that the "act" *described* by the UUV statute is making unauthorized use of a vehicle; the lack of authorization is essential to the character of the physical act, and therefore part of the conduct. Whether one thinks *Simonov* got that answer right is beside the point; what matters here is how *Simonov* framed the question. The question was whether the lack of consent was intrinsic to the nature of the act; it was not whether the lack of consent made the act "criminal."

In *Haltom*, after discussing *Simonov*'s analysis, this court stated that the text of ORS 163.425(1)(a) presents the question whether "the legislature consider[ed] the emphasized phrase 'and the victim does not consent thereto' to be part of the essential character of a prohibited act—subjecting a nonconsenting person to sexual intercourse, etc.—or merely a circumstance that attends the conduct, which is the sexual intercourse itself?" 366 Or at 803. The court then summarized the defendant's argument:

> "Here, defendant contends that the victim's nonconsent is self-evidently part of the essential character of the conduct that ORS 163.425(1)(a) proscribes. Defendant observes, in that regard, that the act or bodily movement that ORS 163.425(1)(a) requires—sexual intercourse (or some other specified sexual act)—is ordinarily considered natural and mutually desirable and is made criminal only when the other person does not consent. Thus, defendant contends, the 'does not consent' requirement is not merely *attendant*

> to the sexual conduct that is proscribed in ORS 163.425 (1)(a), in the way that, for example, the value of stolen property is attendant to the prohibited conduct for theft, thereby increasing the degree of theft that applies but not the essential character of the proscribed conduct. *See Simonov*, 358 Or at 541 (so explaining). Rather, defendant argues, nonconsent changes the essential nature of the specified forms of sexual conduct, which would otherwise be legal, thereby becoming an integral part of the conduct that the statute proscribes."

*Id.* at 803-04. This court went on to affirm that the "[d]efendant's argument faithfully reflects the reasoning" of *Simonov. Id.* at 804.

But the defendant's argument, as summarized by the court in *Haltom*, is consistent with *Simonov* only to the extent that the defendant argued that "nonconsent changes the essential nature" of the specified sexual *acts. Id.* To the extent the defendant argued that nonconsent is part of the conduct because it makes "criminal" what would "otherwise be legal," that argument is not consistent with *Simonov;* rather, it tracks the reasoning *Simonov* cautioned against when it explained that, if an element necessary to create criminal liability was thereby part of the essential character of the act, then there would be no way to differentiate between conduct and circumstances.

Unfortunately, in saying that the defendant's argument was faithful to *Simonov*, *Haltom* did not expressly distinguish between those two variants of the defendant's argument. However, because *Haltom* indicated that it was drawing its test straight from *Simonov*, we should infer that *Haltom* meant to endorse the aspect of the defendant's argument that is consistent with *Simonov*, not the one that is not. And there are additional indicators that that was the court's intent. After briefly summarizing the defendant's argument, the court in *Haltom* engaged in its own extensive discussion of the conduct-vs.-circumstance question, leading to its tentative conclusion (at step one of the "default rule" framework) that lack of consent is a conduct element. 366 Or at 803-11. Neither that lengthy discussion nor the concluding paragraph makes any mention of whether the lack of consent is essential to making sexual contact "illegal."

Instead, as in *Simonov*, the court focused on other factors, including grammar, context, and legislative history. *Id*.

For those reasons, *Haltom* should not be read as adopting a test that frames the "what is conduct" question by asking what turns something "legal" into something "illegal." That, however, is the view adopted by the Chief Justice's dissent, which urges that, under *Simonov* and *Haltom*, an aspect of a criminal statute is part of the "essential character" of the described act if it "make[s] an act that would otherwise be legal into an act that subjects a person to criminal punishment." 370 Or at 182 (Walters, C. J., dissenting); *see id*. (Walters, C. J., dissenting) ("*Simonov* and *Haltom* do not demand that an element be recognized as part of 'conduct' because its *presence* is required to convict a person of a particular offense, but because the element *changes the essential nature of an otherwise legal act in a way that makes the act itself illegal*." (Emphases in original.)). The dissent is correct that *Simonov* and *Haltom* frame the question as whether the element "changes the essential nature" of the act. It is *not* correct that *Simonov* and *Haltom* frame the question as whether the element turns an "otherwise legal act" into an "illegal" act.

That reasoning would create interpretative challenges similar to what *Simonov* anticipated. For one thing, it is not clear what it means to say that an "act" described in a criminal statute would be "otherwise legal." Everything is legal unless a criminal law prohibits it. Saying that a physical act would be "otherwise legal" does not answer any questions; it begs them. If the Chief Justice's dissent means to say that the *physical acts* of sexual contact are somehow inherently "legal" and are rendered of concern to legislators only by a lack of consent, that is incorrect as a matter of historical fact. Consensual sexual activity has been prohibited at different times in contexts such as sodomy, homosexuality, adultery, and incest. So, the acts described in ORS 163.425 and ORS 163.415 are not *always* "otherwise legal." If, on the other hand, the dissent means only to say that sexual acts between two people who ordinarily *are* allowed to engage in them are "otherwise legal" and are rendered

illegal in ORS 163.415 and ORS 163.425 only by a lack of consent, then the statement is tautological.

If *Simonov* had meant to hold that statutory "conduct" can be determined by reference to whether a described aspect of the statute makes an otherwise innocuous act "criminal," it is unlikely that the court in that case would have looked to *State v. Rainoldi*, 351 Or 486, 268 P3d 568 (2011), and *State v. Miller*, 309 Or 362, 788 P2d 974 (1990), for "assistance in distinguishing between elements that describe circumstances and other elements." 358 Or at 542. Although both of those cases, unlike *Haltom* and this one, concerned offenses that are outside the Criminal Code, *Simonov* nonetheless viewed them as "instructive." *Id.* at 543. *Rainoldi* addressed the offense of felon in possession of a firearm, ORS 166.270(1), and *Miller* dealt with the offense of driving under the influence of intoxicants, ORS 813.010. As the court explained them in *Simonov*, both cases hold that the "status" element of the respective offenses—being a felon, and being intoxicated—requires *no* mental state. 358 Or at 543.

What is significant is that, viewed in the terms proposed by the Chief Justice's dissent, the *acts* described in those offenses—possessing a firearm and driving a vehicle, respectively—have as much or more claim to being "otherwise legal" as sexual acts. Only the status of being a felon makes the act of possessing a firearm "criminal," and only the status of being intoxicated makes the act of driving "criminal." Yet, this court has held that those elements are not conduct. If "making something criminal" were the test for what is "conduct," those cases would be in question under the dissent's understanding of *Simonov*—yet *Simonov* quoted them with approval.

In short, neither *Simonov* nor *Haltom* directs that a court should determine whether an element is "conduct" by asking whether it converts an act that would otherwise be legal into one that is criminal. Both cases ask, instead, whether the element is part of the essential character of the described act *as an act*.

I doubt that *Haltom* answered that question correctly. What *Haltom* gave insufficient attention to, in my

view, are the actual statutory definitions on which *Simonov* spent so much time. *Haltom* went straight to *Simonov*, which dealt with an entirely different realm of human behavior. In asking whether the victim's lack of consent is essential to the character of the sexual acts described in ORS 163.425, *Haltom* should have engaged directly with the definitions of "conduct," "act," "sexual contact," and "knowingly." Had that analysis occurred, for the reasons discussed earlier in this opinion, the court would have had difficulty explaining how a victim's nonconsent is an essential aspect either of the act of touching another person's body parts or of the actor's "awareness" that the touching is sexual in nature. Without that analysis, the remainder of *Haltom*'s discussion, although extensive, is not compelling.

Returning to this case, the statutory definitions, together with other evidence cited by the lead opinion, support the conclusion that the legislature would have understood a victim's lack of consent in ORS 163.415(1)(a)(A) to be a circumstance, not part of the actor's conduct. That leads to a presumptive conclusion that the legislature did not intend for a mental state of "knowingly" to apply to the lack of consent. The remaining question is whether other indicators of legislative intent clearly refute that presumption. Seeing no such indicators, I would conclude, like the lead opinion, that the statute does not require a mental state of knowledge for the "does not consent" element.

Balmer, J., joins in this concurring opinion.

**WALTERS, C. J.,** dissenting.

In 1971, the legislature enacted general culpability statutes, which this court has recognized as setting out "a uniform statutory scheme for determining which elements of an offense require which culpable mental states." *State v. Owen*, 369 Or 288, 295, 505 P3d 953 (2022). In *Owen*, decided just four months ago, this court reiterated the "core principles" of those statutes as requiring "an initial determination of the category—conduct, circumstance, or result—under which the material element falls." *Id*. at 308 (quoting *State v. Haltom*, 366 Or 791, 799, 472 P3d 246 (2020)).

In *Simonov*, this court held that, unless otherwise indicated for a particular offense, the minimum culpable mental state for a "conduct" element is a "knowing" mental state. *State v. Simonov*, 358 Or 531, 539-40, 368 P3d 11 (2016). We also construed both statutory terms—"conduct" and "knowingly"—and held that a conduct element is one that applies to "more than a bodily movement"; a conduct element "describe[s] the nature, that is, the essential character, of the prohibited act." *Id*. at 540-41. Finally, we held that, in the crime of unauthorized use of a vehicle, the non-consent element is a conduct element; it is "part of the essential character of the proscribed act" and requires a knowing mental state. *Id*. at 548.

More recently, in *Haltom*, this court adhered to the "core principles" of the general culpability statutes and this court's construction of those statutes in *Simonov*. We held that, in the crime of second-degree sexual abuse, the factual "does not consent" element is a conduct element because it "changes the essential nature of specified forms of sexual conduct, which would otherwise be legal, thereby becoming an integral part of the conduct that the statute proscribes." 366 Or at 804.

In this case, if the lead opinion had abided by the principle of *stare decisis*, and adhered to those same core principles, constructions, and holdings, then the answer to the question posed in this third-degree sexual abuse case would have been straightforward: The lead opinion would have decided that the factual "does not consent" element is a conduct element that, at a minimum, requires a "knowing" mental state.

The lead opinion does not follow that path. It carves out a different one and decides that, for third-degree sexual abuse, the factual "does not consent" element requires only a showing of "criminal negligence." The lead opinion may have made that choice to reflect the fact that, in 2021, after our decision in *Haltom* and after defendant's trial in this case, the legislature amended ORS 163.325 to provide an affirmative defense that now applies in cases of second and third-degree sexual abuse. Or Laws 2021, ch 410, § 1. Under that amendment, defendants who are charged with those crimes

and who prove that they "reasonably believed that the victim consented" to the sexual contact have an affirmative defense to the charged crimes. ORS 163.325(4). As long as the lead opinion's decision in this case is understood as deciding no more than the narrow issue presented here—the minimum mental state for the nonconsent element of third-degree sexual abuse in cases that are governed by the law prior to the 2021 amendment of ORS 163.325—the decision will be of little consequence in future cases; the amended statute, and not the lead opinion's decision, will control. I write, nevertheless, in dissent. I do so to call attention to what I see as the lead opinion's unnecessary and mistaken departure from this court's prescribed and well-reasoned path, and to counsel against similar departures in the future.

1. *The general culpability statutes provide a default rule that should apply in this precise circumstance— when the legislature is silent and does not affirmatively indicate the applicable minimum culpable mental state.*

As the lead opinion acknowledges, the 1971 Legislative Assembly enacted the general culpability statutes, now codified at ORS 161.085 to 161.125, to provide "a uniform statutory scheme for determining which elements of an offense require which culpable mental states." 370 Or at 142 (Flynn, J., lead opinion) (citing *Owen*, 369 Or at 295). One of those statutes is ORS 161.115(2), which this court discussed at length in two prior cases—*Simonov* and *Haltom*. In both cases, we used "our well-established methodology" to construe that statute and the four mental states that are defined in ORS 161.085(7) through (10). In *Simonov*, this court explained that, in ORS 161.115 and ORS 161.085(7)-(10), the legislature provided a set of "core principles" for determining what culpable mental state attaches to an element of a criminal offense when none is specified in the statute. 358 Or at 537-40. Those principles include the one that is at issue here—that, "[u]nless otherwise indicated for a particular offense," a minimum culpable mental state of "knowingly" attaches to an element that constitutes "conduct," as that term is defined in the Criminal Code, while a minimum culpable mental state of criminal negligence

attaches to an element that constitutes a "circumstance." *Id*. at 539-40.

In *Haltom*, this court explained that, in order to "honor[] the *default rule* that is at the heart of the *Simonov* analysis," a court should initially focus on the type of element at issue and the mental state that accompanies that type of element, and then consider any "evidence directed at determining what mental state the legislature might have intended to attach to the element at issue *** to confirm or rebut any tentative conclusion reached under the *default rule analysis*." 366 Or at 802 (emphasis added). The legislature's scheme is elegant and the reason for the two-step process outlined in *Haltom* is obvious: The legislature created a default rule to address the instance in which it fails to expressly state the required mental state for a particular element of a crime. In that instance, the type of element—conduct or circumstance—indicates the minimum culpable mental state, unless (at step two of the analysis) there is an *affirmative* indication that the legislature that enacted the statute intended that some different mental state be required for the element—in spite of its failure to expressly so state. That two-step analysis thus provides a predictable set of rules that promote the legislature's intended uniformity.

In the present case, the lead opinion finds "limits to that path" and suggests that it applies only when an examination of the statute indicates that the legislators who enacted it had a "shared understanding" of the element at issue as a "conduct" or "circumstance" element. 370 Or at 145, 149 (Flynn, J., lead opinion). In support of that theory, the lead opinion points to 1971 legislative history showing that the drafters were unable to agree on how to articulate the distinction between conduct and circumstance and the fact that the legislature has not yet adopted a definition of the term "circumstance" or an express rule for distinguishing between "conduct" and "circumstance" elements. 370 Or at 147-48 (Flynn, J., lead opinion). In so positing, the lead opinion fails to heed the undeniable—that this court already has construed the general liability statutes as providing the necessary definitions and drawing a discernable line.

In *Simonov*, we looked to the statutory definition of the term "knowingly"—which provides, in part, that "knowingly" means that person "acts with an awareness that the conduct of the person is of a nature so described," ORS 161.085(8)—and the dictionary definition of the word "nature" to conclude that "the definitions of the mental states that apply to 'conduct' indicate that they do not merely apply to a particular bodily movement; they also more broadly apply to other elements that describe the nature, that is, the essential character, of the prohibited act." *Simonov*, 358 Or at 541. We also considered other pertinent statutory context that "reinforce[d] that conclusion" and found it "consistent with the *principle that conduct elements are those that describe the nature or essential character of the defendant's act or omission*." *Id*. (emphasis added). We then considered the question of how conduct differs from circumstance and looked to the theft statutes as an example:

> "'Theft' in any degree is defined by ORS 164.015, which describes the prohibited conduct (the taking of property) and the applicable mental state (intent to deprive another of property). *The prohibited conduct for theft in any degree is the taking of another's property with the intent to deprive the owner of it. Id*. A person commits first-degree theft when the person commits theft as defined in ORS 164.015, and the value of the property is $1,000 or more. ORS 164.055. If the value of the property is $100 or more and less than $1,000, the person commits second-degree theft, and if the value of the property is less than $100, the person commits third-degree theft. ORS 164.045 (second-degree theft); ORS 164.043 (third-degree theft).
>
> "The specific value of the stolen property *does not change the essential character of the prohibited conduct*. Accordingly, the value of the stolen property for any degree of theft is a circumstance; it is an accessory fact that accompanies, not modifies, the defendant's conduct."

*Id*. at 541-42 (emphases added). Thus, we concluded, when an element does not change the essential nature of the proscribed act, but instead merely accompanies it, it is a circumstance. *Id*. at 542. It follows from that statutorily derived definitional distinction, as we later expressly recognized in *Haltom*, 366 Or at 804, that, when an element does

change the essential nature of an act or omission, including by changing an otherwise legal act or omission in a way that causes that act to be criminal, the element is part of the "conduct" that the statute proscribes. In reaching that conclusion, we made the determination with which the lead opinion struggles; we determined that, in that instance, the legislature intended and understood the element at issue to be a "conduct" element. *Simonov*, 358 Or at 549.

The lead opinion suggests that, if that definitional distinction were correct, then every element that is required to create criminal liability would be part of conduct. 370 Or at 146 (Flynn, J., lead opinion). But that argument is a red herring. *Simonov* and *Haltom* do not demand that an element be recognized as part of "conduct" because its *presence* is required to convict a person of a particular offense, but because the element *changes the essential nature of an otherwise legal act in a way that makes the act itself illegal*. So, again using theft as an example, to prove liability for first-degree theft, the state must prove that the value of the stolen property is more than $1,000. The value of the property is necessary to establish a violation of that particular statute, but it is not a conduct element because it does not change the essential nature of the proscribed act—the taking of property intending to deprive the owner of it—or make an act that would otherwise be legal into an act that subjects a person to criminal punishment.

Although this court acknowledged, in *Simonov*, that the distinction it derived from Oregon statute might not always provide an easy answer, it also said, in the same breath, that the rule was a "principled one." 358 Or at 544. When the legislature is silent as to its intent with respect to mental state, its silence provides a reason to use the default rule it gives us, not a reason to avoid doing so. In *Simonov* and *Haltom*, this court did not consider whether there was evidence that the legislature had a "shared understanding" of the nature of the nonconsent element at issue. We simply described, and then applied, the distinction we drew from the general culpability statutes—that a conduct element describes the nature or essential character of the proscribed act, meaning that an element is a conduct element if

it changes an act that is lawful into one that is unlawful. We made an initial determination that, for the crimes at issue, the nonconsent elements were conduct elements, pointing to "knowingly" as the minimum culpable mental state. We then looked, but could not find, affirmative indications that the legislature intended to require a different mental state. That path may not always be useful, but it was useful in those cases and certainly should be used in similar cases in the future. Given principles of *stare decisis* and the benefit that the default rule provides, we should be loath to disregard it.

2. *If the lead opinion had followed the analysis in* Simonov *and* Haltom *it would have reached the same conclusion that the court reached in those cases— that to prove nonconsent, the state must prove the defendant acted with a knowing mental state.*

In *Simonov*, the crime at issue was Unauthorized Use of a Vehicle, ORS 164.135(1) (2013). This court began with a discussion of the adverbial phrasing of the statute's "without the consent of the owner" element as an *indication* that that element changes the meaning of the act that the statute references ("ride"), and ended—powerfully—with a more direct application of the distinction between conduct and circumstance than had previously been explained, finding it to be "axiomatic" that "riding without permission is part of the essential character of the proscribed act" and, thus, "conduct." *Simonov*, 358 Or at 547-48. In *Haltom*, we identified that same examination as "the most important factor" in the analysis, agreeing with defendant that the "does not consent" element in the second-degree sexual abuse statute "changes the essential nature of the specified forms of sexual conduct, which would otherwise be legal, thereby becoming an integral part of the conduct that the statute proscribes." *Haltom*, 366 Or at 804. We reasoned that, insofar as the second-degree sexual abuse statute prohibits sexual intercourse—an act that generally is legal and ordinarily mutual and consensual—only when it is of the nature described by the "does not consent" element, that "does not consent" element changes and defines the essential nature of the act or omission that is prohibited and therefore is part of the conduct. *Id.*

If the lead opinion had conducted the same analysis here, then it would have concluded, with little trouble, that the statute's "does not consent" element is a "conduct" element. Under the third-degree sexual abuse statute, ORS 163.415, an act that generally is legal and ordinarily is mutual and consensual—"sexual contact"—is prohibited only when it is of a certain nature, *viz.*, when it is *not* consensual. The "does not consent" element thus "changes the essential nature" of the identified sexual acts, "which would otherwise be legal, thereby becoming an integral part of the conduct that the statute proscribes." *Haltom*, 366 Or at 804. The fact that the "sexual contact" is framed in terms of "subject[ing] another person to sexual contact" reaffirms that conclusion, as did the similar "subject[ing] another person to sexual intercourse" framing for this court's conclusion in *Haltom*.

The lead opinion avoids that analysis. It acknowledges that ORS 163.415(1) uses the same term—"subjects"—that we described, in *Haltom*, as supporting a tentative conclusion that the legislature understood lack of consent to be part of the conduct proscribed in ORS 163.425, because it carries an implication of unwillingness. 370 Or at 153-54 (Flynn, J., lead opinion). But it contends that the structure of ORS 163.415(1)—setting out a physical act as the first element and then, in separate provisions, two alternative ways of proving the second element—points in a different direction, given that, in a footnote in *Simonov*, we called out that precise structure as one that might be used to set out circumstance elements. 370 Or at 153 (Flynn, J., lead opinion). However, in *Haltom*, we expressly rejected reliance on the *Simonov* footnote, 366 Or at 808-09, and the lead opinion does not explain why it is appropriate to rely on the footnote here.

Most significantly, rather than engaging in an analysis of the statutorily derived line between conduct and circumstances that this court outlined and applied in *Simonov* and *Haltom*, the lead opinion concludes that that analysis is not helpful because it finds no support in the text, context, or legislative history for the idea that the physical act identified in ORS 163.415(1)—"sexual contact"—is a

"fundamentally consensual act." 370 Or at 154-56 (Flynn, J., lead opinion). But the lead opinion fails to show why that absence of textual, contextual, or historical support distinguishes ORS 163.415(1) from the statutes at issue in *Simonov* and *Haltom*. In both of those cases, we concluded that it is "axiomatic" that lack of consent changes the essential (or "fundamental") nature of the underlying acts. If the same analysis were applied here, it would inescapably lead to the same conclusion with respect to ORS 163.415(1)—that the "does not consent" element is part of the proscribed conduct.

3. *The evidence that the lead opinion relies on to conclude that the legislature intended a minimum mental state of criminal negligence is not persuasive.*

Finally, the lead opinion relies on questionable evidence to support its conclusion that the legislature that enacted ORS 163.415(1) intended to attach a minimum mental state of criminal negligence to the statute's "does not consent" element. The lead opinion begins with the facts, which I accept, that there are three ways of proving the nonconsent element of ORS 163.415—lack of consent in fact, lack of legal capacity to consent based on age, and other forms of legal incapacity—and that those three ways serve a functionally equivalent role in the statute. 370 Or at 156-57 (Flynn, J., lead opinion). The lead opinion then reasons, based on the affirmative defense set out in ORS 163.325, that, for nonconsent based on legal incapacity to consent, by age or disability, the legislature did not intend that the state be required to prove that the defendant knew of those bases for nonconsent. 370 Or at 157-58 (Flynn, J., lead opinion). The lead opinion concludes that the same must be true of the other type of nonconsent in ORS 163.415—factual consent. 370 Or at 159 (Flynn, J., lead opinion).

The lead opinion's reasoning is not sound. The general rule at common law was that, to be held criminally liable, a person must be aware of the facts that make their actions criminal. However, "statutory rape" was viewed differently. Lack of knowledge of the victim's age was considered a "strict liability" element; the state was not required

to prove that the defendant knew the victim's age. By 1971, however, that approach was considered too harsh. So, rather than follow the historic strict-liability approach for "statutory rape," the 1971 legislature enacted ORS 163.325, which retained strict liability for the nonconsent element of "statutory rape" (and other "statutory sex offenses") when the victim was under 16, but provided that it was an affirmative defense if the person reasonably believed that the victim was over 16. Relatedly, for sexual offenses in which the inability to give legal consent was based on disability rather than age, the legislature made lack of knowledge an affirmative defense.

The text that the legislature used to make those changes is important. For a child under 16, the legislature provided that it is "no defense" that the defendant did not know the child's age. ORS 163.325(1). For a child over 16, the legislature provided that it is "an affirmative defense" for defendant to prove that the defendant reasonably believed that the child was above the specified age. ORS 163.325(2). The drafters used the terms "no defense" and "affirmative defense" differently. In providing that lack of knowledge is "no defense" for crimes against children under age 16, the legislature indicated that the state could prove those crimes without proving defendants' knowledge of the age of the child. But, in providing "affirmative defenses" for other crimes, the legislature established that defendants could defeat liability by proving the affirmative defenses that were provided.

The commentary to the Final Draft and Report of the Proposed Oregon Criminal Code demonstrates that, in doing so, the legislature understood that "statutory rape" was an exception to the general rule requiring knowledge of nonconsent. The commentary states, "The rule that knowledge of the victim's age is not an essential element of the crime of statutory rape and that therefore justifiable ignorance of age is not a defense in a prosecution for that crime is apparently *an exception to the general rule that guilt attaches only where the accused intended to do the prohibited act.*" Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 106, 108 (July 1970) (emphasis added). That italicized phrase indicates

that the drafters believed that the "prohibited act" was not just sexual intercourse but was sexual intercourse with an underage person (with someone who could not legally consent). In addition, the commentary treats "without consent" as key and as part of the prohibited "conduct." Commentary §§ 115 & 116 at 122-23. Thus, the "conduct" includes both the act and the accompanying mental state about the other person's age (that is, the other person's legal nonconsent). And that makes sense, because the "conduct" or "prohibited act" that the drafters were concerned with (and what they defined) was sexual contact *without consent*.

The legislature's enactment of ORS 163.325 shows how carefully the legislature thought about the culpable mental state for sex offenses and that it intended that different types of nonconsent be treated differently. The legislature provided that, for certain offenses, lack of knowledge of nonconsent was "no defense" and, for others, lack of knowledge could constitute an affirmative defense. But the legislature provided (or negated) such defenses only for nonconsent based on age and other legal incapacity. With respect to factual nonconsent, there is no reason to think that the legislature's silence indicates an intent to require a "defense" or an "affirmative defense" to negate the common-law requirement of knowledge. Historically, the state was required to prove that a defendant knew of a victim's factual nonconsent. ORS 163.325 and the legislative commentary explaining it supports the conclusion that the legislature intended that requirement to continue.

Moreover, the lead opinion's analysis ultimately rests on its view—which it draws from *State v. Ofodrinwa*, 353 Or 507, 300 P3d 154 (2013)—that the legislature understood the three alternative ways of proving lack of consent to be essentially equivalent. 370 Or at 156-57 (Flynn, J., lead opinion). Because the lead opinion depends on that understanding, it is worth remembering what the legal issue was in *Ofodrinwa*. The state had charged the 21-year-old defendant with multiple counts of second-degree sexual abuse for having sexual intercourse with his 16-year-old girlfriend. At the trial, the defendant argued that the state had to prove "that the victim had not actually consented; he contended that the victim's lack of capacity to consent was not sufficient

to prove a violation of [ORS 163.425(1)]." *Id.* at 510. The trial court rejected that argument and this court affirmed, holding simply that "the legislature used the phrase 'does not consent' to refer to instances in which the victim does not actually consent and also to instances in which the victim lacks the capacity to consent." *Id.* at 511. Thus, all that *Ofodrinwa* shows is that the legislature recognized (and distinguished between) the three different forms of nonconsent. They viewed the three forms "as alternative ways of proving the same thing—a lack of consent." *Id.* at 514. And, of particular relevance here, given the lead opinion's reliance on ORS 163.325, the court in *Ofodrinwa* noted that the legislature created affirmative defenses that varied depending on the form of nonconsent. *Id.* at 515.

The lead opinion bases its conclusion on its belief that the legislature did not intend to create different rules for culpable mental states for the different forms of nonconsent. But that is exactly what the legislature did through ORS 163.325, which it enacted to change the traditional rule regarding mental states for legal nonconsent—that (as described) no mental state was required. Because that rule was too harsh, the legislature provided affirmative defenses for most forms of legal nonconsent. Notably, those affirmative defenses are different, as is plain from the text of ORS 163.325. For legal nonconsent based on age, defendants are not guilty if they prove that they "*reasonably believed* the child to be above the specified age at the time of the alleged offense." ORS 163.325(2). But for legal nonconsent based on mental or physical incapacity, defendants are not guilty if they prove that they "*did not know* of the facts or conditions responsible for the victim's incapacity to consent." ORS 163.325(3) (emphasis added). In short, the lead opinion rests on the idea that, because the three forms of nonconsent are functionally equivalent, we must assume that the legislature would not reject a "knowingly" mental state for the two forms of legal nonconsent but not for factual nonconsent. But that premise is incorrect, and the lead opinion's reasoning ignores the history and legislative commentary that show that, both before and in the 1971 code, the legislature made different choices regarding the required mental state for factual and legal nonconsent.

The fact that the lead opinion leans so heavily on a questionable inference to support its point with regard to the mental state that attaches to the "does not consent" element of ORS 163.415(1)(a)(A) demonstrates the weakness of its entire approach to the mental state issue. Neither the lead opinion nor the state point to evidence that affirmatively indicates a legislative intent to make criminal negligence of factual nonconsent sufficient to convict a defendant of third-degree sexual abuse under that provision.

4. *Conclusion*

In conclusion, in 1971, the legislature enacted general culpability provisions intended to create a uniform scheme for determining which elements of an offense require which culpable mental state. This court has construed those provisions, and we therefore have the benefit of thoughtfully constructed definitions and "core principles" that set out a process for determining what minimum culpable mental state applies to an element of an offense when the legislature is silent on that point. In this case, the lead opinion finds reason to avoid those "core principles," definitions, and holdings, but its opinion determines nothing more than the minimum mental state for the "does not consent" element of ORS 163.415(1)(a)(A) in prosecutions subject to the law before the legislature amended of ORS 163.325 in 2021. That path is its prerogative, but not one that future courts must, or should, follow. I dissent.

Duncan, J., and Nakamoto, S.J., join in this dissenting opinion.

**DUNCAN, J.,** dissenting.

In criminal law, there is a difference between factual and legal nonconsent to sexual contact. Factual nonconsent is when a person does not acquiesce to the contact. Legal nonconsent is when, even if a person acquiesces to the contact, the person lacks the legal capacity to consent because of the person's age or mental or physical condition. This case involves factual nonconsent. The question presented is whether, when the state charges a defendant with third-degree sexual abuse on the theory that the defendant had sexual contact with another person without that

person's factual consent in violation of ORS 163.415(1)(a)(A), the state must prove that the defendant knew that the other person did not acquiesce to the contact.

Although this case involves factual nonconsent, the lead opinion's answer to that question is ultimately based on ORS 163.325, a statute concerning defenses to sexual offenses involving legal nonconsent. As I will explain, the lead opinion's reliance on that statute is misplaced.

The reasoning of the plurality's lead opinion is as follows. First, the plurality observes that there are different forms of nonconsent: "'(1) when the victim is forcibly compelled to submit; (2) when the victim is considered to be incapable of consenting as a matter of law; and (3) when the victim does not acquiesce in the actor's conduct." 370 Or at 156 (Flynn, J., lead opinion) (quoting Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 105, 106 (July 1970)). Then the plurality cites *State v. Ofodrinwa*, 353 Or 507, 514, 300 P3d 154 (2013), for the proposition that the legislature intended the different forms of nonconsent to be "equivalent." 370 Or at 156-57 (Flynn, J., lead opinion). But the plurality misreads *Ofodrinwa*. All that this court held in that case was that nonconsent could be proven in alternative ways. *Ofodrinwa*, 353 Or at 532 (explaining that the state could prove nonconsent by proving factual or legal nonconsent). *Ofodrinwa* did not hold that the legislature intended the required mental states for the different forms of nonconsent to be "equivalent."

Moreover, we know that the legislature did not intend the mental states for the different forms of nonconsent to be "equivalent." The very statute that the lead opinion relies on to reach its conclusion, ORS 163.325, shows that the legislature did not intend the mental states for those different forms to be the "equivalent," even for the different forms of legal nonconsent. ORS 163.325 provides:

"(1)   In any prosecution under ORS 163.355 to 163.445 in which the criminality of conduct depends on a child's being under the age of 16, it is no defense that the defendant did not know the child's age or that the defendant reasonably believed the child to be older than the age of 16.

"(2)   When criminality depends on the child's being under a specified age other than 16, it is an affirmative defense for the defendant to prove that the defendant reasonably believed the child to be above the specified age at the time of the alleged offense.

"(3)   In any prosecution *** in which the victim's lack of consent is based solely upon the incapacity of the victim to consent because the victim is mentally defective, mentally incapacitated or physically helpless, it is an affirmative defense for the defendant to prove that at the time of the alleged offense the defendant did not know of the facts or conditions responsible for the victim's incapacity to consent."[1]

ORS 163.325 establishes different rules for legal nonconsent based on age and legal nonconsent based on mental or physical incapacity. Indeed, ORS 163.325 even establishes different rules for nonconsent based on age: paragraph (1) provides that lack of knowledge of age is no defense when the complainant is under 16, but paragraph (2) provides that a reasonable belief regarding age is an affirmative defense when the complainant is above 16. So, the premise upon which the lead opinion depends—that the legislature intended to treat the different forms of nonconsent the same or similarly for mental state purposes—is incorrect, even for *legal* nonconsent.

The idea that ORS 163.325 reflects a legislative intent regarding *factual* nonconsent is also incorrect. It ignores the reason for the statute, which was to establish mental state defenses for "statutory rape" and other sex offenses based on *legal* nonconsent. That reason is explained in the legislative history of ORS 163.325. Factual nonconsent and legal nonconsent had been treated differently for mental state purposes prior to 1971. There is no reason to believe that the legislature intended to treat them the same in 1971. To the contrary, the existence of ORS 163.325 and the commentary explaining it show that the legislature was continuing to treat them differently.

---

[1] As the lead opinion notes, "ORS 163.325 remained in the same form from 1971 through the time of the offense for which defendant was prosecuted." 370 Or 157 n 14 (Flynn, J., lead opinion). For that reason, all references to the statute in this opinion are to the original version of the statute unless otherwise noted.

In the commentary, the drafters explained that the then-existing law did not require a culpable mental state for legal nonconsent when the nonconsent was based on the victim's age. Commentary § 106 at 108. Specifically, they stated, "Under present law, it is generally held that a reasonable mistake as to the age of the victim does not exculpate or mitigate the offense." *Id*. The drafters further explained that that view had been criticized by legal commentators and rejected by other courts. *Id*. The drafters specifically mentioned *People v. Hernandez*, 61 Cal 2d 529, 393 P2d 673 (1964), explaining that, until that case, "it was the universally accepted view that the defendant's knowledge of the age of the woman was not an essential element of the crime of statutory rape." Commentary § 106 at 108. The drafters went on to explain that

> "[t]he rule that *knowledge of the victim's age* is not an essential element of the crime of statutory rape and therefore justifiable ignorance of age is not a defense in a prosecution for that crime is apparently *an exception to the general rule that guilt attaches only where the accused intended to do the prohibited act*."

*Id*. (emphases added). Thus, the drafters understood that the "general rule" was that a defendant had to know the facts that caused his actions to be criminal. The law governing "statutory rape" was an exception to the general rule because the state did not have to prove that the defendant knew the fact that caused his act to be criminal: that the victim was underage and by law could not consent.

The drafters' explanation of the then-existing law shows that they understood that the general rule was that a defendant had to know the facts that caused his conduct to be criminal. Under that rule, a defendant charged with a crime based on factual nonconsent had to know that he was acting without factual consent.

The drafters proposed, and the legislature enacted, the provision that was later codified as ORS 163.325 to increase the culpability requirement for "statutory rape" and other sexual offenses based on legal nonconsent. Commentary § 106 at 108-09. In other words, they created the provision to narrow the exception for legal nonconsent.

ORS 163.325 has nothing to do with factual nonconsent. Factual nonconsent was already governed by what the drafters described as the "general rule."

The error in the lead opinion's reasoning is made clear by the fact that, even though *factual* nonconsent has historically been subject to a higher culpability requirement than *legal* consent, the lead opinion's reasoning can lead to the opposite result. To illustrate: Because the lead opinion holds that the required mental state for *factual* nonconsent for third-degree sexual abuse is something other than "knowing," a defendant charged with that crime based on *factual* nonconsent will be guilty even if he did not know that the complainant did not consent; but, under ORS 163.325(3), a defendant charged with that crime based on *legal* nonconsent due to mental or physical incapacity will not be guilty if he did not know that the complainant did not consent. The lead opinion offers no explanation for that different result.

Based on its unsupported belief that the legislature intended the different forms of nonconsent to be treated the same or similarly for mental state purposes, the lead opinion posits that it is significant that ORS 163.325 does not address mental states for factual nonconsent. 370 Or at 159-60 (Flynn, J., lead opinion). The lead opinion's conclusion reflects a failure to appreciate why the legislature enacted ORS 163.325: It needed to specify exceptions to the general rule regarding culpable mental states for legal nonconsent. The reason that ORS 163.325 does not address factual nonconsent is because the legislature intended factual nonconsent to be governed by the general rule, not any special exception.[2] *See* Minutes, Criminal Law Revision Commission, Subcommittee No. 1, Dec 18, 1968, 4 (under the draft, a culpable mental state would be required for every

---

[2] The lead opinion seems to suggest that factual nonconsent was a new concept in 1971 and, therefore, it would not make sense to conclude that a general rule applied to factual nonconsent. 370 Or at 162-63 (Flynn, J., lead opinion). But factual nonconsent was not a new concept in 1971. Factual nonconsent was an element of common law rape, as the commentary to the proposed code states: "At common law, to constitute the crime of rape on a female above the age of consent, three elements must be present: (1) carnal knowledge, (2) force, and (3) the commission of the act without the consent or against the will of the woman." Commentary §§ 109-11 at 113.

element in the definition of a crime and "it was only incumbent upon the Commission to make affirmative exceptions").

A few other points in the plurality's lead opinion merit brief responses. The plurality contends that there is a meaningful difference between the conduct at issue in *State v. Simonov*, 358 Or 531, 368 P3d 11 (2016) (riding in another's vehicle without consent), and *State v. Haltom*, 366 Or 791, 472 P3d 246 (2020) (sexual intercourse without consent) on the one hand, and the conduct at issue in this case (sexual contact without consent). The plurality says:

> "In *Simonov*, the prohibited conduct was so fundamentally different from consensual use of a vehicle that the conduct historically had its own name—'joyriding.' *See* 358 Or at 548 (explaining that '[t]he nature of joyriding is the temporary use of a vehicle without permission')."

370 Or at 155 (Flynn, J., lead opinion). The plurality suggests that the same is not true for the crime at issue here. But of course it is. Nonconsent is the key aspect of all the sexual offenses defined in 1971 code. *See* Commentary § 105 at 106 (stating that the "[l]ack of consent is the common denominator for all the crimes proscribed" in Article 13 of the proposed code, which defines the sexual offenses). It is the essential characteristic of those offenses. And, if the existence of other names matters, sexual contact without consent has its own name; it is "sexual abuse." The nonconsent is what makes sexual contact "abuse."[3]

The plurality also mentions that, when discussing the creation of the crime of sexual abuse, the drafters referenced the crime of assault. 370 Or at 163 (Flynn, J., lead opinion). But that reference does not aid the plurality. The commentary states, "The offense of sexual abuse

---

[3] The lead opinion seems to say that, in *Haltom*, we suggested that sexual intercourse is "fundamentally a consensual act[.]" 370 Or at 154-55 (Flynn, J., lead opinion). The lead opinion is mistaken. In *Haltom*, we recognized, as anyone would, that sexual intercourse may be consensual or nonconsensual and that, if it is consensual, it is not criminal, but, if it is nonconsensual, it is criminal. As in *Simonov*, in *Haltom*, we based our ultimate holding on the fact that what made the defendant's act criminal was the lack of consent. We reasoned that the lack of consent was part of the "essential character" of the act at issue, and, therefore, the lack of consent element was a "conduct" element and, as such, required a "knowing" mental state. *Simonov*, 358 Or at 549; *Haltom*, 366 Or at 803, 823-24.

is intended to cover all *unconsented acts of sexual contact* which do not involve the element of genital penetration. * * * Under the common law *such conduct* would have constituted an assault." Commentary §§ 115 & 116 at 122 (emphases added). Thus, the commentary itself describes the lack of consent as part of the "conduct" that constitutes sexual abuse, which indicates that it requires a "knowing" mental state. *See Simonov*, 358 Or at 539 (explaining that, unless otherwise indicated for a particular offense, if an element is a "conduct" element, it requires a "knowing" mental state); *Haltom*, 366 Or at 798, 811-12 (same); *see also* 370 Or at 145 (Flynn, J., lead opinion) (explaining that "asking whether the legislature understood a particular element to be 'conduct' often will provide the most direct path to understanding whether the legislature intended to require a 'knowing' mental state for the element").

The commentary goes on to explain that, under the proposed code, the crime of assault requires a physical injury and, therefore, a separate crime was needed to cover unconsented sexual contact that does not result in a physical injury:

> "Assault as defined in the draft requires the infliction of actual physical injury. It is contemplated that in many instances the conduct dealt with in the sexual abuse sections would not result in physical injury and, therefore, would not be covered by the assault article. When such sexual contacts do result in injury, the assault sections may also apply."

Commentary §§ 115 & 116 at 122. Thus, the essential character of assault is that it causes physical injury, and the essential character of sexual abuse is that it is without consent, which indicates that the nonconsent element requires a "knowing" mental state. *Simonov*, 358 Or at 549; *Haltom*, 366 Or at 803, 823-24.

Two additional points are worth making. First, the lead opinion is a dead letter. It addresses a legal question that, because of a change in the law, does not matter for future cases. As the lead opinion notes, the legislature has recently amended ORS 163.325 to provide that, in prosecutions for sexual abuse under ORS 163.415 or ORS 163.425

"in which the victim's lack of consent is not based on the inca-
pacity of the victim to consent because of the victim's age, it
is an affirmative defense for the defendant to prove that,
at the time of the alleged offense, the defendant reasonably
believed that the victim consented to the sexual contact[.]"
ORS 163.325(4); Or Laws 2021, ch 410, § 1. Thus, the law on
which the lead opinion is based has been superseded.

     Second, the lead opinion does not actually identify
the required mental state for the nonconsent element in a
case like this. The lead opinion intentionally and carefully
says only that the required mental state is not "knowing." It
does not say what the required mental state is. It does not
say, for example, whether it is "reckless" or with "criminal
negligence." And the lead opinion does not point to anything
to help individuals, lawyers, or courts to make that deter-
mination. In doing so, the lead opinion creates unnecessary
confusion. As this court's reasoning in *Simonov* and *Haltom*
establishes, an element that describes the "essential charac-
ter" of a criminal act or omission is a "conduct" element, and
that, unless the legislature has otherwise indicated, a "con-
duct" element requires a "knowing" mental state. *Simonov*,
358 Or at 549; *Haltom*, 366 Or at 803, 823-24. Given that
the lead opinion has identified no reason for concluding that
the legislature intended any result other than the one that
would follow from application of that rule, this court should
apply it here, as should other courts in similar, future cases.

     For these reasons—as well as those set out in Chief
Justice Walters's dissent, in which I join—I respectfully
dissent.

     Walters, C. J., and Nakamoto, S. J., join in this dissent.